000144

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| v. | ) | CC 01-252, |
| | ) | CC 01-253 |
| AVERY GRIGGS | ) | |
| | ) | |
| Defendant. | ) | |

JURY INSTRUCTION #1

DEFINITION AND BURDEN OF PROOF
FOR THE CHARGE OF ATTEMPTED MURDER

Ladies and Gentlemen of the Jury, you are charged that the Defendant is innocent of the crime of Attempted Murder unless the State prove beyond a reasonable doubt that the Defendant

1.  With the specific intent to cause the death of another person;

2.  Made an overt act towards the commission of causing the death of another person.[1]

Attempted murder is a specific intent crime. The State must prove beyond a reasonable doubt that the Defendant knowingly and intentionally attempted to commit the crime of Murder.[2]

_12/3/01_
Given

_in general charge to
the jury_.

_____
Refused

_____
Circuit Judge

---

[1] Code of Alabama 1975, §§ 13A-4-2, 13A-6-2

[2] Wells v. State, 768 So.2d 412 (Ala.Crim.App.1999)

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

STATE OF ALABAMA            )
                           )
                           )
v.                          )      CC 01-252,
                           )      CC 01-253
                           )
AVERY GRIGGS                )
                           )
        Defendant.          )

JURY INSTRUCTION #3

DEFINITION AND BURDEN OF PROOF
FOR THE CHARGE OF ROBBERY; FIRST DEGREE

Ladies and Gentlemen of the Jury, you are charged that the Defendant is innocent of the crime of ROBBERY; FIRST DEGREE unless the State proved beyond a reasonable doubt that the Defendant

1. Committed a theft; and in commission of that theft

2. Used force against the owner or any person present with intent to overcome his physical resistance; or

3. Was armed with a deadly weapon or dangerous instrument; or

4. Caused serious physical injury to another.[1]

_____                                    _____
                                                   Refused

_____
Given

*incorrect instruction -
but included in general
charge*

_____
Circuit Judge

_____
[1] Code of Alabama 1975, §§13A-8-43, 13A-8-41.

G00146

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| v. | )     CC 01-252, |
| | )     CC 01-253 |
| AVERY GRIGGS | ) |
| | ) |
| Defendant. | ) |

JURY INSTRUCTION #5

DEFENDANT'S CONSTITUTIONAL RIGHT NOT
TO TESTIFY AGAINST HIMSELF

Ladies and Gentlemen of the Jury, you are charged that you may not infer guilty or innocence upon the Defendant for not testifying. The Defendant has a Constitutional right not to testify and you cannot hold that against him for exercising that right. You are not to consider his not testifying in your deliberations.[1]

_12/3/01_
Given

‾‾‾‾‾‾‾
Refused

_____
Circuit Judge

---

[1] Fifth Amendment to the United States Constitution.

000147

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

STATE OF ALABAMA        )
                          )
v.                    )    CC 01-252,
                          )    CC 01-253
AVERY GRIGGS         )
                          )
       Defendant.     )

## JURY INSTRUCTION #6

## CHARACTER TESTIMONY OF MS. CALDWELL

Ladies and Gentlemen of the Jury, you are charged that if you believe the character testimony given by Ms. Caldwell in this case you may find the Defendant not guilty solely on the basis of such testimony.

_____
Given

_____
Refused

_____
Circuit Judge

G00148

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

STATE OF ALABAMA                    )

VS.                                 )          CASE NO.   CC 01-253

AVERY GRIGGS                        )

     DEFENDANT.                      )

<u>GUILTY VERDICT</u>

We the jury, find the defendant, Avery Griggs, guilty of the offense of Attempted Murder as charged in the indictment.

_____
Foreperson

_____
Date

000149

STATE OF ALABAMA,        )   IN THE CIRCUIT COURT OF

    PLAINTIFF,       )   RUSSELL COUNTY, ALABAMA

VS.                  )   CASE NO. CC 01-253

AVERY GRIGGS         )

    DEFENDANT.      )

## VERDICT

December 3, 2001. Now comes the defendant, with assistance of counsel, for trial by a jury of twelve upon his/her plea of not guilty.

December 3, 2001. Now comes the jury and returns its unanimous verdict as follows: "We, the Jury, find the defendant, Avery Griggs, guilty of the offense of Attempted Murder, as charged in the indictment. Date: December 3, 2001; Faye Olds, Foreperson." The verdict being in proper form, the Court accepts the verdict.

The defendant is remanded to the custody of the Sheriff of Russell County. Sentencing is scheduled for January 7, 2002 at 10:00 A.M. Defendant shall remain in jail under no bond.

George R. Greene, Circuit Judge

000150

STATE OF ALABAMA )  IN THE CIRCUIT COURT OF
                  )  RUSSELL COUNTY, AL
VS.               )  CASE NO. CC 01-253
AVERY GRIGGS      )
      DEFENDANT

## SENTENCING ORDER

The defendant and counsel, and counsel for the State of Alabama appeared in open court for the defendant to be sentenced on his/her conviction of ___Attempted murder_____.
_____

## HABITUAL FELONY OFFENDER

___ Defendant is sentenced as a habitual offender under the provision of Section 13A-5-9 and 10 of the Code of Alabama.

## SENTENCE

✓ The Court conducted a sentencing hearing.

✓ A pre-sentence report was requested by the defendant and considered by the Court.

___ Defendant waived a pre-sentence investigation and report.

✓ Defendant is sentenced to the custody of the Commissioner of the Department of Corrections for a period of _____ year(s) ___✓___ life.

___ Sentence to include five (5) years enhancement pursuant to 13A-12-270, Code of Alabama, and an additional five (5) years enhancement pursuant to 13A-12-250, Code of Alabama.

___ Defendant is sentenced to the custody of the Sheriff of Russell County for a period of _____ year(s) _____ month(s).

___ Defendant's sentence shall be concurrent with the sentence(s) imposed in _____.

✓ Defendant shall pay restitution in the amount of $_____ to _____. The Clerk of the court is authorized to collect and disburse the restitution. Restitution is to be paid prior to other court costs.

✓ Defendant shall be given credit for time served.

___ Defendant shall pay a fine in the amount of $_____.

___ Defendant shall pay $10.00 per day incarceration fee.

✓ Defendant shall pay the cost of this case.

✓ Defendant shall pay the Alabama Crime Victims Compensation Commission $250

___ Defendant shall perform _____ hours of community service.

___ Defendant is assessed with $1000.00 penalty mandated by the Demand Reduction Assessment Account, Section 13A-12-281 of the Code of Alabama which will be suspended upon defendant's agreement to enroll in rehabilitation program and pay for same. The defendant may apply to the Court to reduce the amount due by any payments defendant has made.

____ Defendant shall undergo a substance abuse program while at the Department of Corrections.

____ Defendant shall complete a substance abuse program through the Court Referral Officer.

____ Defendant is assessed with $100.00 to Forensic Services Trust Fund Act No. 95-733.

____ Defendant's drivers license are suspended for a period of 6 months.

✓ Defendant shall reimburse the State of Alabama the costs of his/her appointed counsel.

✓ Payment of court ordered monies shall be a condition of parole, early release, S.I.R., or work release.

## SUSPENDED SENTENCE

____ Sentence is suspended, and the defendant is placed on ___supervised ___ unsupervised probation for a period of _____.

## SPLIT SENTENCE

____ Sentence is suspended, and the defendant is placed on supervised probation for a period of _____, however, as a first condition of probation the defendant shall serve a period of _____ in the custody of the commissioner of the Department of Corrections/Sheriff of Russell County. Upon release from incarceration, the defendant must report within 5 days to the Russell County Probation Office.

## REVERSE SPLIT SENTENCE

____ Sentence is suspended, and the defendant is placed on supervised probation for a period of _____; however, upon completion of said probation period, the defendant shall serve a period of _____ in the custody of the Sheriff of Russell County, Alabama.

## BOOT CAMP

____ Defendant shall serve up to 180 days in the custody of the Commissioner of the Department of Corrections and he shall successfully complete the disciplinary, Rehabilitation program. When said program is completed or defendant is released from said program, he shall be returned to this Court for a hearing on his application for probation.

____ Defendant waives any right to appeal and waives any right to any post conviction remedy.

✓ Defendant was advised that he/she has the right to appeal his/her conviction and sentence, and if declared indigent he/she has the right to appointed counsel and the court reporter's transcript will be provided without cost to the defendant.

____ Review is scheduled for _____, 2002 at _____.

____ Defendant gave oral notice of appeal.

DONE and ORDERED in open court this 21st day of ~~January~~ February, 2002.

_____
JUDGE, CIRCUIT COURT

NAME: _Avery L. Griggs_        CC _01-252, 253_

## EXTENSION OF PROBATION OR PAROLE DATE NOTICE FOR FAILURE TO PAY COURT ORDERED MONIES

The length of time of probation or parole shall be automatically extended for six month intervals for all Defendants who have not fully paid all court ordered monies prior to the expiration of their initial term of probation or prior to the end of their parole date. Court ordered monies includes: fines, court costs, fees, and restitution.

The total of court ordered monies due in this case is _~~1221.50~~  1521.50 + Atty fees?_.

All Defendants must keep a current address on file with the Circuit Clerk's Office of Russell County, Alabama. Failure to do so will be considered a violation of the Defendants' probation or parole.

George R. Greene
Circuit Judge

ACR359

ALABAMA JUDICIAL DATA CENTER
RUSSELL COUNTY
TRANSCRIPT OF RECORD
CONVICTION REPORT

000153

CC 2001 000253.00 01
GEORGE R. GREENE

COURT ORI: 057015 J

CIRCUIT COURT OF RUSSELL COUNTY

STATE OF ALABAMA        VS.    ALIAS:
GRIGGS AVERY L                 ALIAS:
21 OAK STREET
FT MITCHELL AL 36856

DC NO: DC 2000 002563.00
G J:    63
SSN:    420371226
SID:    000000000
AIS:

DOB: 05/17/1977    SEX: M   HT: 6 00    WT: 170   HAIR: BLK    EYE: BRO
RACE: ( )W (X)B ( )O   COMPLEXION:        AGE:       FEATURES:

DATE OFFENSE: 03/26/2000   ARREST DATE: 10/20/2000   ARREST ORI: 0570100

| CHARGES @ CONV | CITES | CT | CL | COURT ACTION | CA DATE |
|---|---|---|---|---|---|
| ATTEMPT - MURDER | 13A-004-002 | 01 | A | CONVICTED | 12/03/2001 |
|  |  | 00 |  |  | 00/00/0000 |
|  |  | 00 |  |  | 00/00/0000 |

JUDGE: GEORGE R. GREENE          PROSECUTOR: DAVIS KENNETH E

PROBATION APPLIED    GRANTED DATE    REARRESTED DATE   REVOKED DATE
( )Y( )N             ( )Y( )N         ( )Y( )N

15-18-8, CODE OF ALA 1975   IMPOSED    SUSPENDED    TOTAL    JAIL CREDIT
( )Y (X)N   CONFINEMENT: 00 00 000   00 00 000   00 00 000   00 00 167
            PROBATION : 00 00 000               00 00 000
DATE SENTENCED: 02/21/2002   SENTENCE BEGINS: 02/21/2002

PROVISIONS

PENITENTIARY
CONSECUT SENT
LIFE

| COSTS/RESTITUTION | DUE | ORDERED |
|---|---|---|
| RESTITUTION | $0.00 | $0.00 |
| ATTORNEY FEE | $0.00 | $0.00 |
| CRIME VICTIMS | $250.00 | $250.00 |
| COST | $425.00 | $425.00 |
| FINE | $0.00 | $0.00 |
| MUNICIPAL FEES | $0.00 | $0.00 |
| DRUG FEES | $0.00 | $0.00 |
| ADDTL DEFENDANT | $0.00 | $0.00 |
| DA FEES | $0.00 | $0.00 |
| COLLECTION ACCT | $0.00 | $0.00 |
| JAIL FEES | $0.00 | $0.00 |
| TOTAL | $675.00 | $675.00 |

APPEAL DATE      SUSPENDED      AFFIRMED        REARREST
( )Y( )N         ( )Y( )N       ( )Y( )N        ( )Y( )N

REMARKS:

THIS IS TO CERTIFY THAT THE
ABOVE INFORMATION WAS EXTRACTED
FROM OFFICIAL COURT RECORDS
AND IS TRUE AND CORRECT.

*Kathy Coulter*

KATHY COULTER

02/22/2002

OPERATOR: JOS
PREPARED: 02/22/2002

000154

STATE OF ALABAMA         )    I N THE CIRCUIT COURT OF

                            )

v.                       )    RUSSELL COUNTY, ALABAMA

                            )

AVERY GRIGGS         )    CASE NO. CC-01-252, 253

## NOTICE OF APPEAL TO THE COURT OF CRIMINAL APPEALS OF ALABAMA

Notice is hereby given that AVERY GRIGGS appeals to the above named Court from the judgment of conviction entered in this case on the 3rd of December, 2001, adjudging the Defendant to be guilty of the offense of Robbery, 1st Degree and as punishment thereof sentencing the Defendant to life in prison to serve in the Department of Corrections of the State of Alabama.

N. KIRKLAND POPE (POP018)

ATTORNEY FOR DEFENDANT

POPE & RAYFIELD, P.C.
P.O. BOX 849
PHENIX CITY, ALABAMA 36868-0849

Filed: March 6, 2002

FILED IN OFFICE
2002 MAR -6 PM 3: 23
CIRCUIT FIRST COURT
RUSSELL CO. AL

000155

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date served copy of the foregoing motion by placing a true and correct copy of the same in a receptacle reserved for the District Attorney in the Office of the Clerk of Court's of Russell County, Alabama.

This the 6th day of March, 2002.


ATTORNEY FOR DEFENDANT

| State of Alabama<br>Unified Judicial System<br>Form ARAP-26 (front)   8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br>**000156** |
|---|---|---|

## A. GENERAL INFORMATION:

☒ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF _____ RUSSELL _____ COUNTY

_____ AVERY GRIGGS _____, Appellant

v.   ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____

| Case Number<br>CC-01-252, 253 | Date of Complaint or Indictment<br>March 16, 2001 | Date of Judgment/Sentence/Order<br>12/03/01 // 02/21/02 |
|---|---|---|
| Number of Days of Trial/Hearing<br>1                                Days | Date of Notice of Appeal<br>Oral:                          Written: 03/06/02 | |

Indigent Status Requested: ☒ Yes ☐ No          Indigent Status Granted: ☒ Yes ☐ No

## B. REPRESENTATION:

Is Attorney Appointed or Retained? ☒ Appointed ☐ Retained.     If no attorney, will appellant represent self? ☐ Yes ☐ No

| Appellant's Attorney (Appellant if pro se) *(Attach additional pages if necessary)*<br>N. KIRKLAND POPE | Telephone Number<br>334.298.7062 | |
|---|---|---|
| Address<br>1110 Broad Street | City<br>Phenix City | State   Zip Code<br>AL        36867 |

## C. CODEFENDANTS: List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
|---|---|
| Codefendant | Case Number |
| Codefendant | Case Number |

## D. TYPE OF APPEAL: Please check the applicable block.

1 ☒ State Conviction
2 ☐ Post-Conviction Remedy
3 ☐ Probation Revocation
4 ☐ Pretrial Order
5 ☐ Contempt Adjudication
6 ☐ Municipal Conviction
7 ☐ Juvenile Transfer Order
8 ☐ Juvenile Delinquency
9 ☐ Habeas Corpus Petition
10 ☐ Other (Specify) _____

## E. UNDERLYING CONVICTION/CHARGE: Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____
2 ☐ Homicide - § _____
3 ☒ Assault - § 13A-4-2
4 ☐ Kidnapping/Unlawful Imprisonment - § _____
5 ☐ Drug Possession - § _____
6 ☐ Trafficking in Drugs - § _____
7 ☒ Theft - § 13A-8-41
8 ☐ Damage or Intrusion to Property - § _____
9 ☐ Escape - § _____
10 ☒ Weapons/Firearms - § 13A-8-42
11 ☐ Fraudulent Practices - § _____
12 ☐ Offense Against Family - § _____
13 ☐ Traffic - DUI - § _____
14 ☐ Traffic - Other - § _____
15 ☐ Miscellaneous (Specify): _____

## F. DEATH PENALTY:

Does this appeal involve a case where the death penalty has been imposed?   ☐ Yes ☒ No

## G. TRANSCRIPT:

1. Will the record on appeal have a reporter's transcript?   ☒ Yes ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _03/06/02_
(Date)
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk?   ☐ Yes ☐ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions? ☐ Yes ☐ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

FILED IN OFFICE
2002 MAR -6 PM 3: 23
LEGAL ASST. CLERK
RUSSELL CO., AL

G00157

Form ARAP-26 (back)    8/91    COURT OF CRIMINAL APPEALS DOCKETING STATEMENT

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case. Avery Griggs, in committing a theft of a Lincoln Navigator used or threatened imminent use of force against Demetrius Jackson while armed with a firearm. (13A-8-41)

Avery Griggs did with the intent to commit the crime of murder(13A-6-2) attempt to intentionally cause the death of Demetrius Jackson by shooting him with a firearm (13A-4-2).

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. (Attach additional pages if necessary.)

1. Sentencing.

2. Court erred in its ruling of Defendant's Batson Motion.

3. Court erred in failing to grant judgement of acquittal.

**K. SIGNATURE:**

March 6, 2002

_Date_

_Signature of Attorney/Party Filing this Form_

REPORTER'S TRANSCRIPT ORDER -- CRIMINAL

| State of Alabama Unified Judicial System Form ARAP-1C   8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL  See Rules 10(c) and 11(b) of the Alabama Rules of Appellate Procedure (A.R. App. P.) | Criminal Appeal Number  000158 |
|---|---|---|

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

[X] CIRCUIT COURT   [ ] DISTRICT COURT   [ ] JUVENILE COURT OF _____ RUSSELL _____ COUNTY

AVERY GRIGGS _____, Appellant

v.   [X] STATE OF ALABAMA   [ ] MUNICIPALITY OF _____

| Case Number  CC-01-252 & CC-01-253 | Date of Judgment/Sentence/Order  12/03/01 // 02/21/02 |
|---|---|
| Date of Notice of Appeal  Oral:              Written:   03/06/02 | Indigent Status Granted:  [X] Yes   [ ] No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*)

_____     _____     _____
Signature                    Date                         Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R. App. P.)):

MARK PROCEEDINGS REQUESTED:                                          COURT REPORTER(S)

A. [X] TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately

LINDA WILSON

B. [X] ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause  Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs  (See Rule 19.4, ARCrP)

LINDA WILSON

C. [ ] ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs  (See Rule 19.4, ARCrP)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. Batson Motion Hearing | | LINDA WILSON |
| E. | | |
| F. | | |
| G. | | |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective  Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript  A general designation such as "all proceedings" is not sufficient  (See Rule 10(c)(2), A.R. App. P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW  I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_____     March 6, 2002     N. Kirkland Pope
Signature                    Date                Print or Type Name

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

ACR371
000159

NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEAL
BY THE TRIAL COURT CLERK
IN THE CIRCUIT COURT OF RUSSELL COUNTY

STATE OF ALABAMA VS GRIGGS AVERY L          JUDGE: GEORGE R. GREENE

---

APPEAL DATE: 03/06/2002

INDIGENCY STATUS:
  GRANTED INDIGENCY STATUS AT TRIAL COURT:      _X_ YES   ____ NO
  APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:  ____ YES   _X_ NO
  INDIGENT STATUS REVOKED ON APPEAL:            ____ YES   _X_ NO
  INDIGENT STATUS GRANTED ON APPEAL:            _X_ YES   ____ NO

DEATH PENALTY: NO

APPEAL TYPE: STATE CONVICTION

---

THIS IS AN APPEAL FROM A CONVICTION.

DATE OF CONVICTION: 12/03/2001          DATE OF SENTENCE: 03/31/2002

YOUTHFUL OFFENDER STATUS: DENIED

CO/CASE NUMBER: 57/CC 2001 000253.00
CODE: MURDA   CONVICTION: ATTEMPT - MURDER   ACTION: CONVICTED
                                             STATUTE: 13A-004-002

SENTENCE:  CONF: 00 YRS 00 MOS 000 DAYS
SENTENCE:  PROB: 00 YRS 00 MOS 000 DAYS       LIFE: YES  LIFEWO: NO

---

POST-JUDGMENT MOTIONS FILED:   DT FILED      DT DENIED    CON BY AGREE
  ___ MOTION FOR NEW TRIAL
  ___ MOTION FOR JUDG. OF ACQUIT  _____    _____    _____
  ___ MOTION TO W/D GUILTY PLEA   _____    _____    _____
  ___ MOTION FOR ATTY TO W/DRAW   _____    _____    _____
  ___ OTHER                       _____    _____    _____

---

COURT REPORTER(S):            WILSON, LINDA S.
ADDRESS:                      C/O HON. GEORGE R. GREENE
                              PHENIX CITY  , AL  36867

APPELLATE COUNSEL #1:         POPE NEAL KIRKLAND
ADDRESS:                      1110 BROAD STREET

                              PHENIX CITY  , AL  36867
PHONE NUMBER:                 334-298-7062

APPELLATE COUNSEL #2:         _____
ADDRESS:                      _____
                              _____
                              _____
PHONE NUMBER:

APPELLANT (PRO SE):           GRIGGS AVERY L
ADDRESS:                      21 OAK STREET
                              FT MITCHELL  , AL  368560000
AIS #:

APPELLEE (IF CITY APPEAL):    _____
ADDRESS:                      _____
                              _____

---

I CERTIFY THAT THE INFORMATION PROVIDED                    OPERATOR: SHG
ABOVE IS ACCURATE TO THE BEST OF MY          PREPARED: 03/07/2002
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS 7TH DAY OF Mar. 02      CIRCUIT COURT CLERK

000160

TO COMPLETE THE REPORTER'S TRANSCRIPT

Avery L. Griggs    v. State of Alabama
Appellant's Name                    Appellee

Trial Court Case No. CC01-252    Notice of Appeal Date 3/6/02
                     CC01-253

On appeal from the: ☒ Circuit Court of
                    ☐ District Court of  } Russell County
                    ☐ Juvenile Court of

I, Linda Wilson , a court reporter in the above referenced case,
hereby request a 28 - day extension to complete the transcript in said cause for the reasons
I have set out below. Currently this transcript is due on 5/1/02 , and with this extension
the transcript will be due on 5/29/02 .

REASONS: _____

_____

_____

_____

Linda Wilson                     5/1/02
Court Reporter                   Date

========================================================
                    TRIAL COURT ACTION

☒ Upon consideration of the above request, I hereby grant a 28 - day extension to complete said transcript, thus extending
   the transcript's due date to 5/29/02 . Upon granting this request, I direct the court reporter to file this order
   with the Clerk of this Court and to mail or fax a copy hereof to the Clerk of the Court of Criminal Appeals at the address
   noted below by no later than the transcript due date in effect immediately preceding this order.

☐ The above referenced request for a local extension is denied.

                                 5/1/02
George R. Greene                 Date
Judge's Signature

Note:   Pursuant to Rule 11(c) of the Alabama Rules of Appellate Procedure, local extensions cannot total more than 28
days and cannot be to a date more than 84 days from the date of the notice of appeal.
========================================================

The Clerk of the Court of Criminal Appeals    Fax (334) 242-4689
P. O. Box 301555
Montgomery, Alabama 36130-1555

JUDICIAL BUILDING, 300 DEXTER AVENUE

P.O. BOX 301555

MONTGOMERY, AL 36130-1555

000161

H. W. "Bucky" McMILLAN
Presiding Judge
  E BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

May 8th, 2002

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

IMPORTANT NOTICE

Linda S. Wilson, Court Reporter
Court Reporter
1600 46th Street
Phenix City, AL 36867

RE: CR-01-1189
   Avery L. Griggs v. State of Alabama (Appeal
   from Russell Circuit Court: CC01-252;
   CC01-253).

Dear Linda S. Wilson:

        Our records indicate that the transcript in the above referenced case was due to be
filed with the circuit clerk on May 1st, 2002.  If our information is incorrect, you should
contact this Court immediately to straighten this matter out.  Otherwise, to prevent this
court from remanding this cause back to the trial court with directions that the trial court
take specific action regarding the delinquent transcript, please be advised that you should
complete and file this transcript by no later than  May 29th, 2002.

Sincerely,

Lane W. Mann, Clerk
Court of Criminal Appeals

LWM/di

cc:  Honorable George R. Greene, Circuit Judge
     Honorable Kathy S. Coulter, Circuit Clerk
     Honorable Neal Kirkland Pope, Attorney, Appellant
     Office of Attorney General

**000162**

# MOTION TO COURT OF CRIMINAL APPEALS FOR EXTENSION OF TIME TO FILE TRANSCRIPT

Fax: (334) 242-4689

TO:  The Clerk of the Court of Criminal Appeals
     P. O. Box 301555
     Montgomery, Alabama 36130-1555

Criminal Appeals Case Number          CR ____ - ____

__Avery L. Griggs__                    v. __State of Alabama__
Appellant's Name                          Appellee

Trial Court Case No. __CC01-252__    Notice of Appeal Date __3/6/02__
                     __CC01-253__

On appeal from the:  [X] Circuit Court of
                     [ ] District Court of     __Russell__ County
                     [ ] Juvenile Court of

I, __Linda Wilson__ , a court reporter in the above referenced case,
hereby request a __28-__ day extension to complete the transcript in said cause for the reasons
I have set out below. Currently this transcript is due on __5/29/02__ , and with this extension
the transcript will be due on __6/26/02__ .

REASONS: _____
_____
_____
_____
_____
_____
_____

__Linda Wilson__              __5/29/02__
Court Reporter                   Date

Note:    Rule 11(c) of the Alabama Rules of Appellate Procedure prohibits an appellate court from
granting an extension if the request is not received by the clerk of the appellate court within the time
originally prescribed or before the expiration of an extension previously granted. Based on internal
policy of the Court of Criminal Appeals, no more than two 28-day extensions will be granted.

JUDICIAL BUILDING, 300 DEXTER AVENUE
P.O. BOX 301555
MONTGOMERY, AL 36130-1555

000163

May 29th, 2002

4. W. "Bucky" McMILLAN
 residing Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

RE: CR-01-1189

Avery L. Griggs v. State of Alabama (Appeal from Russell Circuit Court: CC01-252; CC01-253).

        You are hereby notified that the following action was taken in the above cause by
the Court of Criminal Appeals:

        Additional time is granted to certify the completion of reporter's transcript to and
including 06/26/2002.

Lane W. Mann, Clerk
Court of Criminal Appeals

LWM/sm

cc: Honorable George R. Greene, Circuit Judge
    Honorable Kathy S. Coulter, Circuit Clerk
    Linda S. Wilson, Court Reporter
    Honorable Neal Kirkland Pope, Attorney, Appellant

000164

# MOTION TO COURT OF CRIMINAL APPEALS FOR EXTENSION OF TIME TO FILE TRANSCRIPT

Fax: (334) 242-4689

TO:  The Clerk of the Court of Criminal Appeals
P. O. Box 301555
Montgomery, Alabama 36130-1555

Criminal Appeals Case Number    CR _____ - _____    v.  _State of Alabama_

_Avery L. Griggs_
Appellant's Name                              Appellee

Trial Court Case No. _CC 01-252_    Notice of Appeal Date _3/6/02_
_CC 01-253_

FILED IN OFFICE
2002 JUN 27  AM 8: 26
CIRCUIT CLERK
RUSSELL CO. AL

On appeal from the: ☑ Circuit Court of
☐ District Court of    _Russell_    County
☐ Juvenile Court of

I, _Linda Wilson_____, a court reporter in the above referenced case,
hereby request a _28-_ day extension to complete the transcript in said cause for the reasons
I have set out below. Currently this transcript is due on _6/26/02_____, and with this extension
the transcript will be due on _7/24/02_.

REASONS: _____

_____

_____

_____

_____

_____

_____

                                    _6/26/02_
_Linda Wilson_                      Date
Court Reporter

Note:    Rule 11(c) of the Alabama Rules of Appellate Procedure prohibits an appellate court from
granting an extension if the request is not received by the clerk of the appellate court within the lim
originally prescribed or before the expiration of an extension previously granted. Based on intern
____ _____ _____ Appeals, no more than two 28-day extensions will be granted.

JUDICIAL BUILDING, 300 DEXTER AVENUE
P.O. BOX 301555
MONTGOMERY, AL 36130-1555

000165

June 26th, 2002

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

H. W. "Bucky" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

RE: CR-01-1189

Avery L. Griggs v. State of Alabama (Appeal from Russell Circuit Court: CC01-252; CC01-253).

        You are hereby notified that the following action was taken in the above cause by the Court of Criminal Appeals:

        Additional time is granted to certify the completion of reporter's transcript to and including 07/24/2002.

                                        Lane W. Mann, Clerk
                                        Court of Criminal Appeals

LWM/sm

cc: Honorable George R. Greene, Circuit Judge
    Honorable Kathy S. Coulter, Circuit Clerk
    Linda S. Wilson, Court Reporter
    Honorable Neal Kirkland Pope, Attorney, Appellant

FILED IN OFFICE
2002 JUN 28 PM 1:58
CIRCUIT/DIST. COURT
RUSSELL CO. AL

STATE OF ALABAMA

IN THE CIRCUIT COURT FOR THE COUNTY OF RUSSELL

TWENTY-SIXTH JUDICIAL CIRCUIT


AVERY L. GRIGGS,       )
                    )
        Appellant,    )
                    )   CRIMINAL ACTION
        v.           )   CASE NO. CC 01-252
                    )          CC 01-253
STATE OF ALABAMA,    )
                    )
        Appellee.     )


**REPORTER'S INDEX TO EXHIBITS**

| NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| State's Exhibit 1 | Buyer's Order | X |
| State's Exhibit 2 | Photo | X |
| State's Exhibit 3 | Photo | X |
| State's Exhibit 4 | Photo | X |
| State's Exhibit 5 | Photo | X |
| State's Exhibit 6 | Photo | X |
| State's Exhibit 7 | Photo | X |
| State's Exhibit 8 | Photo | X |
| State's Exhibit 9 | Business Card | X |
| State's Exhibit 11 | Photo | X |
| State's Exhibit 12 | Photo | X |
| State's Exhibit 13 | Photo | X |
| State's Exhibit 14 | Photo | X |
| State's Exhibit 15 | Photo | X |
| State's Exhibit 16 | Identi-Kit | X |
| State's Exhibit 17 | Yellow Paper W/Address | X |
| State's Exhibit 18 | TIC Membership Card | X |
| Deft.'s Exhibit 1 | Photo | X |
| Deft.'s Exhibit 2 | Photo | X |
| Deft.'s Exhibit 3 | Photo | X |
| Deft.'s Exhibit 4 | Photo | X |
| Deft.'s Exhibit 5 | Photo | X |
| Deft.'s Exhibit 6 | Photo | X |
| Deft.'s Exhibit 7 | Photo | X |



**RETAIL ORDER FOR A MOTOR VEHICLE**

**GATEWAY LINCOLN / MERCURY, INC.**

*2 Locations to serve you!*

1300 5th Ave. • Columbus, GA 31901     45th St. and Beallwood Conn.
322-5575                                571-2492

SALES • LEASING • SERVICE

P.O. BOX 1119 • COLUMBUS, GEORGIA 31902

Date 300167
Stock No. OP979?
Salesman ___

Purchaser Al Thomas     Home Ph. 706 587-9523  Bus. Ph. ___
Address 947 34th Pl     D.O.B. ___
City Col     County ___     State GA     Zip 31907

| New ☐ | Used ☐ | Demonstrator ☐ | Car ☐ | Truck ☐ |

| AUTO TRANS. ☐ | AIR COND. ☐ | POWER WINDOWS ☐ | AM ☐ AM-FM ☐ TAPE ☐ | OTHER ☐ | T - TOPS ☐ |
| SPT WHLS ☐ | CRUISE ☐ | TILT ☐ | POWER SEATS ☐ | POWER LOCKS ☐ | SUN ROOF ☐ |

**DESCRIPTION OF PURCHASE**

Year 2000  Make ___  Model 2272
Body ___  Color ___  Mileage 2272
I.D. No. 5LMRU27A2YLJ06278
Cyl. ___  Tag # ___  Decal # ___

**DESCRIPTION OF TRADE-IN**

Year ___  Make ___  Model ___
Body ___  Color ___  Mileage ___
I.D. No. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
Cyl. ___  Tag # ___  Decal # ___
Amount ___
Payoff to ___
Address ___
City ___  State ___  Zip ___
Good Until? ___  Talked to? ___
Last Paid? ___  Second Lein? ___

Purchaser hereby sells and transfers unto Dealer the used car described herein and warrants that he has absolute title thereto and that same is free from any liens or encumbrances except as disclosed herein, provided however, if there is any difference between the actual pay-off on the vehicle traded in and the balance as stated herein, then and in that event if Purchaser fails to pay said difference within 24 hours after demand, Dealer may at its election, declare this agreement null and void with no title passing to Purchaser, and Purchaser agrees to return to Dealer immediately the vehicle sold to Purchaser.

Name of Ins. Company ___
Policy No. ___
Name of Ins. Agent ___
Address ___  Phone ___
City ___  State ___  Zip ___
Lienholder ___
Address ___
City ___  St. ___  Zip ___
Lien Code ___

| List Price | | |
| Dealer Installed Options | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL  LIST  PRICE** | 38,500 | 00 |
| Trade-In Allowance | | |
| TRADE DIFFERENCE | 38,500 | 00 |
| Document Preparation Fee | 199 | 00 |
| Sub Total | 38,699 | 00 |
| Sales Tax | 2208 | 93 |
| Luxury Tax | | — |
| GA M.V. Warranty Rights Fee | | — |
| Tag | 21 | 00 |
| Title | 18 | 00 |
| Total Difference / Selling Price | 41,446 | 93 |
| Service Agreement | | |
| Ad Valorem Tax on Trade-In | | |
| Owing on Trade-In | | |
| Cash ☐      Check ☐ | | |
| TOTAL AMOUNT FINANCED | | |

*What type of advertising brought you to Gateway?*

☐ TV      ☐ Newspaper      ☐ Radio

☐ Previous Customer      ☐ Customer Referred

☐ Other ___

Purchaser agrees that th[...]nd conditions on both the face and reverse side hereof, that the Order cancels and supersedes any prior agreement and as of the [...]te and exclusive statement of the terms of the agreement relating to the subject matters covered hereby, and that THIS ORDER SHALL [...]ACCEPTED BY DEALER OR HIS AUTHORIZED REPRESENTATIVE. Purchaser by his execution of this Order acknowledges that he has [...] has received a true copy of this Order.

STATE'S EXHIBIT 1

Accepted By: ___

___                    ___                    ___
Signature of Purchaser          Date          Dealer or His Authorized Representative

DISCLAIMER OF WARRANTIES: Any warranties on the products sold hereby are those made by the manufacturer. The Seller, GATEWAY LINCOLN / MERCURY, Inc., hereby expressly disclaims all, warranties either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and the Seller, GATEWAY LINCOLN / MERCURY, Inc., neither assumes nor authorizes any other person to assume any liability in connection with the sale of said products.

Nix "On-Time" Printing (706) 324-6862

000168



000169







000171



000172



G00173





000174



000175




GATEWAY

ISUZU Ⓜ LINCOLN Mercury Ⓜ

**DEMETRIUS A. JACKSON**

CERTIFIED, PROFESSIONAL SALES CONSULTANT
GATEWAY LINCOLN MERCURY & ISUZU
1300 5TH AVENUE, COLUMBUS, GA 31901
PHONE:706-322-5575  •  FAX: 706-323-5653

000176



000177



000178



000179



000180





# Large-Size Composite Printout

UNITED STATES EXHIBIT 76    00131

Case Number:    00PL22680



Identi-Kit 2000 Software -- Version 3.1

000182



10-31-2000

keeper: 762-3609

9046 35th Ave
31906

Owned and Operated
Thomas Howell II

000183



Anna Roberts
397-0324

C00184



000185



**FT. BENNING OFFICE**
P.O. Box 52236
Ft. Benning, GA 31995-2236

**706-320-6740**

**PEACHTREE OFFICE**
4811 Bankers Blvd
Columbus, GA 31901

**UPTOWN OFFICE**
1101 Veterans Pkwy
Columbus, GA 31901

**MEDICAL OFFICE**
707 Center St, Suite 212
Columbus, GA 31901

**NORTH OFFICE**
7300 Veterans Pkwy
Columbus, GA 31909

000186



DEFENDANT'S
EXHIBIT

000182









000188











DEFENDANT'S
EXHIBIT

000189



















000191









DEFENDANT'S
EXHIBIT

# 6









DEFENDANT'S
EXHIBIT

#7

000193

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP- 14         11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|

TO:  THE CLERK OF
    THE COURT OF CRIMINAL APPEALS OF ALABAMA

DATE OF
NOTICE OF APPEAL:  MAR 6, 02

APPELLANT

        AVERY L. GRIGGS

V.  STATE OF ALABAMA

---

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) ( 1  volumes of 200 pages each and one volume of _157_ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

Dated this _21ST_ day of __AUGUST_____, 19 _2002_

_____
Kathy Coulter / Sx
Circuit Clerk

RUSSELL COUNTY, ALABAMA

1

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C    8/91 | **REPORTER'S TRANSCRIPT ORDER -- CRIMINAL**<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number |
|---|---|---|

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

[X] CIRCUIT COURT   [ ] DISTRICT COURT   [ ] JUVENILE COURT OF    RUSSELL                    COUNTY

AVERY GRIGGS                                                        , Appellant

V.   [X] STATE OF ALABAMA   [ ] MUNICIPALITY OF _____

| Case Number<br>CC-01-252 & CC-01-253 | Date of Judgment/Sentence/Order<br>12/03/01 // 02/21/02 |
|---|---|
| Date of Notice of Appeal<br>Oral:                    Written:    03/06/02 | Indigent Status Granted:<br>[X] Yes    [ ] No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY **(1)** THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR **(2)** THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

| Signature | Date | Print or Type Name |
|---|---|---|

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R App.P)):

**MARK PROCEEDINGS REQUESTED:**                                    **COURT REPORTER(S)**

A. [X] **TRIAL PROCEEDINGS** - Although this designation will include the judgment and sentence    LINDA WILSON
proceedings, a transcript of the organization of the jury and arguments of counsel must
be designated separately

B. [X] **ORGANIZATION OF THE JURY** - This designation will include voir dire examination and    LINDA WILSON
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be
recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. [ ] **ARGUMENTS OF COUNSEL** - Note that in noncapital cases the arguments of counsel will
not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D.  Batson Motion Hearing | | LINDA WILSON |
| E. | | |
| F. | | |
| G. | | |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be certified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY **(1)** THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR **(2)** THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, **(3)** THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

| Signature | Date    March 6, 2002 | Print or Type Name    N. Kirkland Pope |
|---|---|---|

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: **(1)** Clerk of the Court of Criminal Appeals, **(2)** the District Attorney, **(3)** the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and **(4)** to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

### INDEX TO REPORTER'S TRANSCRIPT

Reporter's Transcript Order                        1
Index                                              2
Caption (December 3, 2001)                         3
Court's Introduction of Case to Jury Venire      4-6
Batson Motion                                      7
Court's Opening Instructions to Jury            7-14
Opening Statement by Mr. Davis                 14-20
Opening Statement by Mr. Pope                  20-22

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| For the State: | | | | |
| Demetrius Jackson | 22-48 | 48-62 | 62-63 | |
| Jesse McKinnon | 63-69 | 69-70 | | |
| Bryant Harris | 70-80 | 80-83 | | |
| Randy Lavoie | 83-88 | 88-92 | | |
| Greg Ballard | 92-95 | 95-98 | | |
| Michael Vargo | 98-122 | 123-131 | 132-134 | 134-135 |

Motion                                           136

For the Deft.:
Morris Griggs           137

Objections to Closing Arguments          138-139
Jury Charge                              139-155
Verdict                                  156-159
Sentencing                               160-163
Reporter's Certificate                       164

STATE OF ALABAMA

IN THE CIRCUIT COURT FOR THE COUNTY OF RUSSELL

TWENTY-SIXTH JUDICIAL CIRCUIT

CRIMINAL


STATE OF ALABAMA

    v.                         Case No. CC 01-252
                                         CC 01-253

AVERY L. GRIGGS,

        Defendant.
_____/


REPORTER'S OFFICIAL TRANSCRIPT

Before:

        Honorable George R. Greene and Jury
          Phenix City, Alabama - December 3, 2001


APPEARANCES:

        For the State:
           Kenneth E. Davis, Esq.
           District Attorney

        For the Defendant:
           Kirk Pope, Esq.
           Phenix City, Alabama


Linda S. Wilson
Official Court Reporter

4

1          (Jury venire present and sworn.)

2          (General identification of the jury

3           venire.)

4      THE COURT:  All right, ladies and

5  gentlemen.  That would conclude the oral

6  identification of the jury.  We will now proceed

7  with the call of the case.

8      Which case would the State call at this

9  time?

10     MR. DAVIS:  If it please the Court, at this

11 time we call State of Alabama versus Avery

12 Griggs, charged with robbery in the first degree

13 and attempted murder, Cases CC 01-252 and

14 01-253.  The State of Alabama is ready.

15     THE COURT:  Do you have a witness list?

16     MR. DAVIS:  I do, Judge.

17     THE COURT:  Is the defense ready?

18     MR. POPE:  Defense is ready, Your Honor.

19     THE COURT:  All right, ladies and gentlemen

20 of the jury.  The State has called for trial two

21 cases that are styled the State of Alabama versus

22 Avery Griggs.

23     In Case Number CC 2001-252, the Defendant is

24 charged in the indictment with the offense of

25 robbery in the first degree.  The indictment is

1    not evidence in the case and should not be

2    considered by you as evidence.  It is merely the

3    written means by which the case is brought to

4    court for trial.  In this indictment it alleges

5    that Avery Griggs did, in the course of

6    committing a theft of a Lincoln Navigator

7    automobile, the property of Demetrius Jackson,

8    use force or threaten the imminent use of force

9    against the person of Demetrius Jackson, with the

10   intent to overcome his physical resistance or

11   physical power of resistance or to compel

12   acquiescence to the taking of or escaping with

13   the property, while the said Avery Griggs was

14   armed with a deadly weapon or dangerous

15   instrument, in this case alleged to be a firearm,

16   in violation of Section 13A-8-41 of the Code of

17   Alabama of 1975.  That is a charge of robbery in

18   the first degree.  To this charge, the Defendant

19   has entered a plea of not guilty.

20        In Case Number CC 2001-352, the indictment

21   in this case alleges that Avery Griggs did, with

22   the intent to commit the crime of murder, attempt

23   to intentionally cause the death of another

24   person, Demetrius Jackson, by shooting the said

25   Demetrius Jackson with a pistol or other firearm,

a further and better description being otherwise

unknown to the grand jury, in violation of

Section 13A-4-2 of the Code of Alabama of 1975,

as amended, that being a charge of attempt to

commit murder.  To this charge, the Defendant has

entered a plea of not guilty.

     I'm going to ask the jurors, would you

please stand and raise your right hands?

                    (Jury venire sworn.)

                    (Voir dire of jury venire.)

          THE COURT:  State have anything further?

          MR. DAVIS:  State's satisfied.

          THE COURT:  Defendant have anything

further?

          MR. POPE:  Defendant is satisfied, Your

Honor.  Thank you.

          THE COURT:  All right, ladies and

gentlemen.  We'll begin the process of selecting

a jury.  I anticipate about 25 minutes.  You may

remain in the courtroom or in the hallway.  Don't

get too far away, and we'll try to promptly start

back in about 25 minutes.  Thank you.

                    (Counsel and the circuit court clerk

                     struck the jury without the presence

                     of the court reporter.)

*Vol 2*

COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF _____RUSSELL_____ COUNTY, ALABAMA

CIRCUIT COURT NO. CC01-252 & 253

CIRCUIT JUDGE ____HON. GEORGE R. GREENE____

Type of Conviction / Order Appealed From: ____ROBBERY 1ST & ATTEMPTED MURDER____

Sentence Imposed: ____LIFE CONSECUTIVE W/CC 01-253, $250. VCF EA CASE,____

Defendant Indigent: ☒ YES ☐ NO    ATTY FEES, COSTS, RESTITUTION.

_____AVERY L. GRIGGS_____

**NAME OF APPELLANT**

HON. NEAL KIRKLAND POPE  334-298-7062
(Appellant's Attorney)                    (Telephone No.)
1110 BROAD STREET
(Address)
PHENIX CITY, AL  36867
(City)            (State)            (Zip Code)

### V.

____STATE OF ALABAMA____

**NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____
_____

(For Court of Criminal Appeals Use Only)


EXHIBIT
A

1           (Jury venire not present.)

2       THE COURT:  We have a motion?

3       MR. POPE:  Yes, Your Honor.  The Defendant

4   would like to raise a Batson motion in that the

5   State, out of its seven strikes, chose six black

6   members to strike from the panel and only one

7   white juror.

8       THE COURT:  Anything further?

9       MR. POPE:  No, Your Honor.

10      THE COURT:  The Court would deny your Batson

11  motion for insufficient showing of the basis for

12  your claim.  Are we ready to start?

13      MR. POPE:  Yes, sir.

14          (Jury venire present.)

15          (Jury impaneled.)

16          (Rest of jury venire dismissed.)

17          (Jury sworn.)

18      THE COURT:  There were two cases that were

19  called for trial for today, and both of these

20  cases come to the Court by way of an indictment.

21  I've already read out the indictment to you

22  previously and so I will not read them again, but

23  keep in mind the indictment is not evidence in

24  the case and should not be considered by you as

25  evidence in the case.  It is merely the written

means by which this case is brought before you for trial. The indictment also serves the purpose of notifying a defendant with particularity of the offense with which he is charged, and it sets out the elements of each offense which must be proved by the State of Alabama.

Before proceeding with the trial of the case, the Court will explain the rules of procedure that will be followed by you and the Court in this case. This is a criminal case. The procedure for the trial of these cases, as in criminal cases of the same character, will be as follows: Mr. Davis on behalf of the State will make an opening statement, then Mr. Pope will make an opening statement outlining the defense. Each side in the opening statement will be confined to an outline of the case and a statement of what they expect the evidence to show. Their statements are intended to inform you and the Court about the case, so that we will both be familiar with the theories and contentions of each side from the beginning.

Following these opening statements by the attorneys, witnesses will first be called by the

1    State to testify.  After the State has presented

2    witnesses, the Defendant will then be permitted

3    to call witnesses to testify.  All witnesses will

4    be sworn and will testify under oath.  Their

5    testimony will be evidence.  There may be

6    exhibits offered which, if received by the Court,

7    will also be evidence.  It will be upon this

8    testimony and these exhibits that you may

9    consider in arriving at your final verdict, and

10   you may consider only the testimony and these

11   exhibits in reaching your final verdict.

12       Following the close of evidence in the case,

13   the attorneys will again have the privilege of

14   addressing you, and this is referred to as

15   summation or closing argument.  The attorneys

16   have the right to discuss the evidence and all

17   the reasonable inferences to be drawn therefrom

18   to help you arrive at a just and true verdict.

19   Mr. Davis on behalf of the State will have the

20   right to open the arguments, followed by Mr. Pope

21   on behalf of the Defendant.  Mr. Davis will have

22   the right to a second closing argument, and this

23   is based primarily on the fact that the burden is

24   upon the State of Alabama to prove the Defendant

25   guilty as charged.

1    Following the arguments of the attorneys, it

2    will be the duty of the Court to state to you the

3    applicable rules to guide you in arriving at your

4    verdict.  The case will then be submitted to you

5    for your deliberation.  Upon retiring to the jury

6    room to consider your verdict, you elect one of

7    your number as foreperson to moderate your

8    discussion and to sign and return the verdicts

9    chosen by you to the Court.

10    It is my duty as judge to see that the trial

11    progresses in an orderly fashion, to rule upon

12    all legal matters that are presented, to define

13    the issues involved, and to instruct the jury as

14    to the law particular to the particular case.  It

15    will be your duty as jurors to follow the law as

16    so stated to you by the judge.

17    In determining what the true facts are from

18    the evidence in this case, you may take into

19    consideration any natural interest or bias a

20    witness may have as a result of any connection

21    with the case.  You may take into consideration

22    the interest or bias a witness may have shown

23    while testifying.  And you may take into

24    consideration the demeanor of any witness, as to

25    whether the witness has apparently testified

frankly or evasively.  You may take into
consideration any matter which you would in your
everyday affairs in passing upon the truthfulness
and accuracy of the testimony.  Weigh the
testimony in the light of your common observation
and experience and reach a verdict that will be
based upon the truth as you determine it from all
of the evidence.

During the course of the trial, I may rule
on objections by the attorneys as to the
admissibility of testimony or other evidence.  It
is the duty of an attorney to make such
objections to the offer of evidence which he
deems illegal or improper.  You must not concern
yourselves with the reasons for my rulings since
they are controlled and required by rules of
law.  You are not to speculate as to possible
answers to questions which I do not require to be
answered.  The overruling of objections to
evidence is not intended to indicate the weight
to be given such evidence by you.  This admitted
evidence will be considered along with all the
other evidence.  You are to disregard any offer
of evidence or evidence which may be excluded by
the Court.

1    An attorney is an officer of the court. It

2    is the duty of an attorney to present evidence on

3    behalf of the client, to make such objections as

4    he deems proper, and to fully argue his client's

5    case. An attorney's statements and arguments are

6    intended to help you understand the evidence and

7    apply the law. However, their statements are not

8    evidence, and you should disregard any remark,

9    statement or argument which is not supported by

10   the evidence or by the law as given to you by the

11   Court. Likewise, statements made by the Court

12   are not evidence and are not to be considered by

13   you as evidence.

14   No juror should attempt to make an

15   individual investigation of the facts or of

16   anyplace testified about. You are not authorized

17   to gather evidence on your own account or on

18   behalf of any of the parties to this case. You

19   should not visit the scene of any alleged

20   incident or attempt to inspect or examine any

21   object or property unless that object or property

22   has been received into evidence and your

23   inspection is made either in the courtroom or in

24   the jury room with the Court's permission.

25   As a juror, you have a legal right to take

notes during the trial, but the Court does not
generally recommend the taking of notes by
jurors.  If notes are taken by you, they should
be taken simply as an aid to your memory and for
your assistance in that regard, and they may not
be exhibited to the other jurors as an
authoritative record.

Until the cases are submitted to you for
your deliberations, you must not discuss the
cases with anyone, nor permit anyone to discuss
these cases with you or in your hearing.  You are
to keep an open mind, and you shall neither
discuss nor decide any issue in this case among
yourselves until the cases are submitted to you
for your deliberations under the instructions of
the Court.  If members of your family or friends
or anyone else should ask you about these cases,
you should tell them that you are under the
Court's instruction not to discuss it.  When the
trials are over and your verdict rendered, you
will then be released from this instruction and
then you'll be free to discuss the cases and your
experiences as a juror, if you so desire.

The attorneys, parties and witnesses are not
permitted to talk to you during the trial.  Even

1    a discussion which has no relation to the cases

2    might give a bad appearance.  If the participants

3    in the trial fail to greet with you or converse

4    with you during the trial, it will be due to this

5    rule.

6        That would conclude the Court's opening

7    statement instructions.  We will now begin with

8    opening statements by the attorneys, first by Mr.

9    Davis, then by Mr. Pope.  Mr. Davis?

10       MR. DAVIS:  May it please the Court, Mr.

11   Pope.

12       MR. POPE:  Mr. Davis.

13       MR. DAVIS:  And ladies and gentlemen of the

14   jury.  One more time, good morning.  It is still

15   before noon.  Demetrius Jackson -- would you

16   stand up, Mr. Jackson -- is a cars salesman.  He

17   is now a cars salesman and has been for some time

18   at Rivertown Ford.  You can have a seat.  He's

19   also a lay minister.  He preaches when he's not

20   selling cars.

21       In August of 2000, he was a car salesman,

22   but he worked at another dealership.  He worked

23   at Gateway Lincoln-Mercury.  It's over on 5th

24   Avenue, I think.  And on the 26th of August of

25   2000, he went to work, I suppose much in the same

fashion that he went to work every day, hoping to

sell a car, hoping to make a living; not

expecting that that day would be much different

from any other day at work.  We expect that the

evidence in this case, ladies and gentlemen, is

going to show that that case -- that day became

very different.  It became a day burned in the

memory and the mind of Demetrius Jackson for the

rest of his life, no matter how long he lives.

It was a day that he had the misfortune of

meeting this Defendant, Avery Griggs, because on

that day, we expect the evidence to show, at

about 3:00 in the afternoon, Avery Jackson (sic)

walked into Gateway Lincoln-Mercury, he

approached Mr. Jackson and he told Mr. Jackson

that he had his eye on a white Lincoln Navigator

back there that he wanted to buy, and Mr. Jackson

began to talk to him about how he would pay for

that car, asked him his name.  The Defendant, Mr.

Griggs, says my name is Al Thomas.  He asked

him -- Mr. Jackson asked him if he wanted to

drive the car.  At that time he didn't.  The

Defendant told Mr. Jackson that he worked at Mead

Coated Board, gave him an address of 947 34th

Avenue, Columbus, Georgia, told him he was going

1   to pay a large sum of cash down on this car.  Mr.

2   Jackson asked him about financing the car and

3   about running a credit history.  He didn't want a

4   credit history run.  He insisted that he would

5   get his financing at TCIC, that he would do that

6   himself.  He left; that is, the Defendant,

7   calling himself Al Thomas, left the dealership,

8   was gone for a while, and he returned later that

9   evening.

10       He got back.  He spoke not only with Mr.

11  Jackson, but with Mr. Lavoie who worked there at

12  the dealership.  He was seen by Mr. Harris who

13  worked there at the dealership.  Ultimately, the

14  Defendant, Avery Griggs, wanted to test-drive

15  this car, this white Lincoln Navigator, and so

16  Mr. Jackson let him get in the car.  He got in

17  the car with him.  Mr. Jackson got on the

18  passenger side, and they went to drive the car.

19       I think they went out Veterans Parkway

20  first.  The Defendant said I need to get this car

21  somewhere where I can get it up to speed.  I want

22  to get it up to about 70 and see how it does.

23  Mr. Jackson noticed that there was very little

24  gasoline in the car, so they left Columbus, came

25  to Phenix City, stopped at the B.P. gas station

1    out on the 280 Bypass, and Mr. Jackson put about

2    three dollars worth of gasoline in the car.  They

3    got back in the car, continued south on 280,

4    until you get to where you turn off on 431.

5        The Defendant, driving this Lincoln

6    Navigator, turned off on 431, started down that

7    roadway and began to accelerate to get the car up

8    to a higher speed; 75, 80 miles an hour.  He

9    began driving erratically.  He reached in his

10   pocket or his waistband or somewhere and took out

11   a silver pistol and shot Mr. Jackson through his

12   left arm.  The bullet went through his arm into

13   his side.  It went down into his back, and it's

14   still there today because it was never removed by

15   the doctor.

16       Mr. Jackson, with this automobile going at

17   over 70 miles an hour, jumped out of the car to

18   save his life because that's the only thing he

19   could do.  That's the only thing he could think

20   to do.  And he rolled along the highway for

21   almost 300 feet.  You're going to see the

22   photographs of the injuries that he received that

23   day.

24       The Defendant, calling himself Al Thomas,

25   whose real name is Avery Griggs, Avery Laprez

1    Griggs, went on down the roadway, left Mr.

2    Jackson laying in the road shot, turned right

3    going toward the Sandfort Road.  Luckily for Mr.

4    Jackson, there were some local people, some

5    people driving there who saw him jump out of the

6    car.  They stopped.  One of them was Mr. Jesse

7    McKinnon, tried to give him assistance.  The

8    police were called.  They responded to the

9    scene.

10        They do the things that police officers

11    always do when they begin to investigate a crime;

12    roped the area off, took photographs, noted where

13    blood spots were, looked for any evidence they

14    could find in the scene.  Talked to Mr. Jackson,

15    talked to the other witnesses who saw what

16    happened on the highway.

17        Mr. Jackson was transported to The Medical

18    Center.  He had surgery.  He was there for a

19    number of days.  The police talked to him.  They

20    talked to other people at Gateway Lincoln, and

21    they began to search for this person, search for

22    who they believed at that time to be Al Thomas.

23        First thing they found was that 947 34th

24    Avenue had a person who lived there, but it

25    wasn't Al Thomas, and nobody that lived there had

ever heard of Al Thomas and there was no Al
Thomas.  They got what's called an Identi-Kit
done by Mr. Jackson.  That's where you try with a
computer to make a sketch of what you believe the
person that you're looking for looks like.  They
talked to people in the neighborhood.  Talked to
other witnesses.  Fingerprinted the -- let me
back up and say this.

Shortly after these events of the 26th; in
fact, I believe it was on September the 1st in
Birmingham, Alabama, the Birmingham Police
Department found that Lincoln -- white Lincoln
Navigator abandoned on 10th Avenue, and it was
transported back to Phenix City, Alabama.  It was
towed back.

The police tried to lift fingerprints.  In
fact, they lifted some fingerprints off of it and
they tried to run them through the computer.
They were unable to match them up with anybody.
They investigated other leads, including a lead
in -- what they believed to be a lead in Lanett,
Alabama.  They were getting nowhere.

Mr. Jackson, on October the 19th, along with
his friend, Bryant Harris, who also worked at
Gateway were at Peachtree Mall in Columbus,

Georgia, sometime in the afternoon of that day and what they both saw and instantly recognized was the Defendant, Avery Griggs, walking around in Peachtree Mall.  Mr. Jackson notified mall security.  The police in Columbus were notified.  The police from Columbus responded.  The Defendant was arrested at that time, and it was discovered that his real identity was Avery Jackson and found in his wallet at that time was the business card of Demetrius Jackson.

Now, Demetrius Jackson is going to get on this witness stand, ladies and gentlemen, and tell you that that's the man that changed his life.  That's the man who shot him.  That's the man who stole his vehicle.  That's the man who left him on the roadway.  Thank you.

THE COURT:  Mr. Pope?

MR. POPE:  If it please the Court, Mr. Davis.

MR. DAVIS:  Mr. Pope.

MR. POPE:  This incident took place at the end of August.  The identification took place in the middle of October.  Mr. Davis did mention that they brought the vehicle back and they processed the vehicle for fingerprints, and a lot

of fingerprints were taken off the vehicle.  When

they arrested my client, the Defendant, they ran

those fingerprints that they took off that

vehicle against my client.  Not one matched.

They're saying my client took this

automobile.  He drove it around and he took it

down Sandfort Road and he took it towards

Birmingham.  He drove this vehicle and all these

fingerprints were taken off this vehicle, but not

one matched with my client.

When they were doing the initial

investigation, the police went out to Gateway

Lincoln-Mercury.  They went to the desk where the

individual who did this crime sat down, filled

out the application, took fingerprints of the

palm, and they ran that and they arrested my

client.  They ran that against my client.  Did it

match?  Did they match?  No, they did not.

The business card was lifted of the victim

in this case off my client when he was arrested.

The victim sells automobiles.  He sees people

every day looking at automobiles.  In the process

of doing that, he hands out business cards so

that they'll come back and remember him to

purchase a vehicle.

1          The identification took place two months

2     after the incident.  There's no physical evidence

3     that points to my client.  The fingerprints,

4     physical evidence whatsoever to say that my

5     client committed this crime, ladies and

6     gentlemen.  We have an identification that took

7     place two months after the incident.  Thank you

8     very much.

9          THE COURT:  Who would the State call as its

10     first witness?

11          MR. DAVIS:  We call Mr. Jackson.

12                    DEMETRIUS JACKSON

13          was affirmed and testified as follows:

14                    DIRECT EXAMINATION

15  BY MR. DAVIS:

16  Q    Would you tell the ladies and gentlemen of the

17       jury your name, please, sir?

18  A    Demetrius Jackson.

19  Q    Mr. Jackson, where do you live?

20  A    3755 Oak Drive, Columbus, Georgia.

21  Q    And how long have you lived there?

22  A    Three years now.

23  Q    Are you married, Mr. Jackson?

24  A    I am now, sir.

25  Q    Is this your wife sitting in the back back here?

1    A    That's her, sir.

2    Q    Where do you work, Mr. Jackson?

3    A    I work at Rivertown Ford in Columbus.

4    Q    And how long have you worked there?

5    A    A year now, going on a year.

6    Q    You sell new cars?

7    A    Everything.

8    Q    Used cars and new cars?

9    A    Yes, sir.

10   Q    Is that the first experience in the car business

11        that you've had, or have you been in the car

12        business before?

13   A    Nine years at Gateway Lincoln-Mercury.

14   Q    Before that, what kind of work did you do?

15   A    I was in the restaurant business for seven years

16        and in the advertising business for a year.

17   Q    Mr. Jackson, back on -- back in August of 2000,

18        were you working at Gateway Lincoln-Mercury?

19   A    Yes, I was, sir.

20   Q    How long did you work there?

21   A    Up until that point, going into my ninth year.

22   Q    On August the 26th of 2000, were you working that

23        day at Gateway?

24   A    Yes, I was, sir.

25   Q    I know we all know, but where is Gateway?

1   A    1300 5th Avenue, Columbus, Georgia, 31901.

2   Q    When you went to work at Gateway, what time do

3        you go to work in the morning?

4   A    Normally get there about 8:30, and after a sales

5        meeting, everything begins at nine.

6   Q    The 26th, do you remember what day of the week

7        that was?

8   A    It was on a Saturday, sir.

9   Q    Saturday a busy time for car dealers?

10  A    Yes, sir.  Most of the time, yes, sir.

11  Q    How many salesmen would there be at Gateway on

12       August the 26th?

13  A    Mostly all of them, which would probably -- it's

14       a small dealership.  Probably about eight people

15       would normally be there.

16  Q    And you go to work at 8:30.  How long do you work

17       there?

18  A    On Saturdays, we get off at six.

19  Q    And you worked all day that day?

20  A    Yes, sir, I did.

21  Q    Sometime in the afternoon of that day, did you

22       have a customer?

23  A    Yes, I did.

24  Q    Tell us about that, Mr. Jackson.  What happened?

25  A    A gentleman came up, said he had been looking at

1     a Land Cruiser, a '97 Land Cruiser, and he liked

2     the white Navigator.  And he quoted me a price of

3     like $37,000 that he could possibly get this Land

4     Cruiser for, and I said -- and it was a '97.  I

5     said man, I could get you this 2000 with only

6     about, I guess, 3,000 miles on it for $38,500.

7   Q   Where were you having the conversation with this

8     fella?

9   A   At this time we were out by the Lincoln

10    Navigator.

11  Q   Okay.  What happened then?

12  A   He said it sounds good.  And I asked him if he

13    would like to test-drive it, and he said no, that

14    he would like to go to his bank.  I asked him who

15    his bank was and he said TIC; that he needed a

16    write-up.  And earlier that day they had told me

17    that if you turn anybody over to another bank

18    that you would be fined $25, so I had to take him

19    inside so that I could get a manager TO, a

20    business manager TO, so I wouldn't get fined $25.

21  Q   Who would that be?

22  A   Randy Lavoie.

23  Q   Randy Lavoie works there, too?

24  A   Yes, sir.  He was the business manager.

25  Q   And did you introduce this person to Randy

1      Lavoie?

2  A    Yes, sir.  I had to go in and fill out a buyer's

3      order and then take him into the business office

4      so that they can do a printed sheet for him to

5      take to TIC.

6  Q    A buyer's order.  What is that?

7  A    That's where you give all the VIN number, you

8      give the name of the person, and you give the

9      salesman's name and so -- and the figures so that

10     they can take to TIC, and then you give them your

11     business card so that they can identify who to

12     call back if the loan is approved or if not

13     sometimes.

14  Q   Okay.  Let me show you what's been marked now by

15     me as State's Exhibit 1.  Do you recognize that?

16  A   Yes, sir.  That's my initials in the corner.

17  Q   What is that?

18  A   That's a buyer's order.

19  Q   It's got writing on there?

20  A   Yes, sir.  It's got the VIN number and the

21     mileage of what was on the vehicle.

22  Q   Did you put that on there?

23  A   Yes, I did, sir.

24  Q   Did you put it on there in the presence of this

25     person, whoever he was?

1    A    Yes, sir.

2    Q    And you got some information from him; is that

3         right?

4    A    Yes, sir.

5    Q    How about a name; did you get a name?

6    A    He said his name was Avery Thomas.  He gave me a

7         phone number and an address.

8    Q    What address?

9    A    947 34th Avenue, Columbus, Georgia.

10   Q    And you got things like price and that sort of

11        thing?

12   A    I've got the price, the mileage and the VIN

13        number so that it can be identified.

14   Q    Now, that person, Mr. Jackson, who came in that

15        day and said he was Al Thomas or Avery Thomas, do

16        you see him here in the courtroom?

17   A    Yes, sir.

18   Q    I want you to stand up and I want you to tell the

19        ladies and gentlemen of the jury who he is and

20        where is he?

21   A    It's this gentleman sitting right here, the black

22        gentleman.

23   Q    Any question in your mind whatsoever?

24   A    No doubt.  100 percent.

25   Q    Thank you.  Now, you went in and introduced him

1        to Mr. Lavoie; is that right?

2   A   That's correct, sir.

3   Q   Did you stay there while he was with Mr. Lavoie?

4   A   Well, I was going back and forth, but I went back

5        in and stood there while Lavoie was interviewing

6        him on where he was getting his money from and

7        all those things.

8   Q   Well, what happened after that?

9   A   Well, he didn't want to talk anything.  Randy was

10       trying, I guess, to quote him some quotes where

11       perhaps maybe we could beat the deal that TIC has

12       sometimes.

13   Q   You mean the financing?

14   A   The financing deal, yes, sir, but basically he

15       didn't want to hear it.  So Randy Lavoie released

16       him to me, I gave him the buyer's order and he

17       had my card, and basically we were waiting to see

18       if he would come back or if TIC would call us to

19       verify anything.

20   Q   So he left the dealership?

21   A   He left the dealership at that time.

22   Q   Did you see how he left?  Did he leave on foot,

23       or did he leave by car?

24   A   No, sir.  We were so busy, no, sir, and I had

25       several other customers that day.

1    Q    Well, how long would you say that that defendant

2         who called himself Al Thomas at that time was

3         there that first time; five minutes, 10 minutes,

4         an hour?

5    A    No, sir.  He had to have been been there probably

6         30 or 40 minutes the first time.

7    Q    Did you see him again that day?

8    A    Yes, sir.  He came back later on in the

9         afternoon.

10   Q    What time; do you know?

11   A    It had to have been about an hour or so before

12        closing because I had planned to make

13        arrangements to leave town, and he had came in

14        right before we closed.

15   Q    What happened then?

16   A    I asked him basically had he got his money and --

17   Q    Let me stop you.  Sometimes I get ahead of

18        myself.  When you saw him, where did you see him;

19        inside the car place or on the lot or where?

20   A    No, sir.  I was working two customers at the

21        time, and the other salesman recognized who he

22        was and they said that he was here.

23   Q    So what happened?

24   A    And I just told him -- basically, I went and

25        grabbed the keys and said if you want to take a

1        test-drive, you can go, but I've got several

2        other customers that I have to finish up with.

3    Q   Do you let people test-drive cars?  I mean, if I

4        walked up and said I want to test-drive a car,

5        could I just have the car and drive off?

6    A   Sometimes.  It's just really depending on how

7        busy you are, but yes, sir, you can.

8    Q   Is that what happened in this case, you just gave

9        him the car and he drove?

10   A   Well, no, sir, he never did leave.  He said he'd

11       wait for me.

12   Q   And so what happened?

13   A   So basically, I was -- I had to get finished up

14       with two other customers that I had, which it

15       started to be getting later on in the day, so I

16       went out to try to maybe take a shorter

17       test-drive so that we could get back and finish

18       up before I had to get off, so I entered the car

19       on the passenger side.  He had been in the

20       vehicle probably 10, 15, maybe more minutes than

21       I could get out there.  Maybe a little bit longer

22       than that.  I opened up the door, the passenger

23       door to get in, and he was playing a CD that he

24       had already engaged in the cartridge.

25   Q   Do you remember what the CD was?

1    A    No, sir.  It was rap.  I mean, I don't know.  I

2         don't like it.  It was just a lot of loud noise,

3         it was.

4    Q    So it wasn't your CD?

5    A    No, sir, it wasn't.  And I asked him whose CD it

6         was, and he said it was his.

7    Q    What happened then?

8    A    I said well, we'll just go up the road apiece.  I

9         got a short trip that I normally demo up to

10        Anthony -- I think Anthony Methodist Church right

11        there off of Veterans Parkway.  So we begin to

12        pull out, and he had looked up and it said 12

13        miles till empty.  There's a monitor on all

14        Navigators where it says 12 miles till empty.  So

15        he looked up and he pointed at it and he said is

16        that accurate.  I said well, basically, sometimes

17        it is.  Just depending on stops and go's on

18        whether that computer is accurate or not, so we

19        pulled on off and went up Veterans Parkway and I

20        made the turn there, and he said I've got one

21        more place I've got to go because I come across

22        the bridge coming to work a lot on 280 to come

23        into Columbus, so you know, a Lincoln customer, I

24        just said well, let's do it, let's go.  So we

25        drove down to and come across the overpass there

1      to come into Phenix City, and it said three miles

2      till empty.

3  Q  You mean on this display in the car?

4  A  Yes, sir.  It had gotten down to three miles till

5      empty.

6  Q  Okay.  What'd you do then?

7  A  So immediately I told him I knew it was a BP

8      Station up on the right.  If we could get to it,

9      then I could get some gas, so that's where we

10     stopped at.  So we pulled --

11  Q  Is that down there by the Holiday Inn?

12  A  It's right across the street from, yes, sir.

13  Q  What did you do at the B.P. Station?

14  A  Well, we pulled up to get gas and the gas was

15     running, so I told him to cut the tank off

16     because it will create a problem with the

17     emission system, so I couldn't fill it up with

18     the gas with the car running, so he cut it off.

19     And I think I put -- I know I put $3.00 in, but

20     maybe $3.01, because they'll reimburse you for

21     $3.00 or less for gas.  They won't reimburse you

22     for anything else.

23  Q  They, the people you work for?

24  A  That's correct.  They won't -- you can't put a

25     whole lot of gas in there.  So I went in and paid

1   them, and I think it was $3.01, and I bought a

2   set of Red Hot toothpicks at the same time, and I

3   walked back out and he had already started the

4   vehicle, and I got back in the truck.

5 Q What happened then?

6 A I offered him -- I just told him basically I

7   hadn't had Red Hot toothpicks in years since I

8   was a kid, would you like one, and I think I had

9   a pack of maybe two, and he said no.  So we

10   pulled out, and this time we started going

11   towards Wendy's on 280, on 280 Bypass.

12 Q Okay.  That'd be going north then; is that right?

13 A That would be going like going to Auburn, but

14   traffic was real heavy.  His music was playing

15   pretty loud, and when we crossed 80 to like go to

16   Wire Road or go to Tuskegee, it was just so

17   backed up and he said it was just so congested,

18   he said he got one more place to go if I had

19   time, and certainly I said yes.  So we did a turn

20   right there at one of the side medians and come

21   back and come through the 80 light.

22 Q And then where did you go?

23 A Well, he said -- he asked me basically do I have

24   the time and I said well, basically, I'm not

25   going anywhere but home, and he said yes indeed

34

1    and then he continued to drive.  So we got down

2    to 431 and we made a right on 431, and they were

3    doing construction work there and he said

4    basically, you know, that's a rough area.  We

5    were talking about how congested it was because

6    of the ramps were being worked.  And he got on

7    431 like you're going to Eufaula, and then he

8    just begin to increase speed.  He let a few cars

9    go by and we were talking, and so as he began to

10   increase, he started increasing the speed.

11 Q   Did you get nervous at all about that?

12 A   Well, no, sir, because it's 65 out there, so

13   basically 65, 70 you feel pretty comfortable on

14   that road out there.

15 Q   What happened then, Mr. Jackson?

16 A   Well, a few cars passed us and then we got in

17   front, and then he just continued to start

18   speeding.  So we got past, I think, Troy -- where

19   you turn into Troy and Chattahoochee School and

20   just where you could probably visually see 165 to

21   go to, I guess, the back way to Fort Benning, I

22   just said basically -- I looked up and said hey,

23   let's just turn around up here, this will be good

24   enough, and we'll just come back and finish up

25   the paperwork.

1   Q   Did the Defendant say anything?

2   A   Never did.  I just looked back down, and that's

3       when I saw the gun.

4   Q   Where was the gun?

5   A   It was resting like on the console where the CD

6       package sits.

7   Q   Is that the first time you had seen the gun?

8   A   Yes, sir.

9   Q   Do you remember anything about the gun?

10  A   It was silver and it had black handles.

11  Q   Was the gun just laying there, or was it in the

12      Defendant's hand?

13  A   It was in his hand, but it was resting across the

14      console.

15  Q   In his right hand or his left hand?

16  A   I couldn't remember because I just really

17      basically got nervous at that time.

18  Q   When you saw this gun, Mr. Jackson, what did you

19      think, if you remember?  I mean, what crossed

20      your mind?

21  A   I just started screaming and yelling.

22  Q   And what happened?

23  A   And I opened up the door and tried to get out.

24  Q   You want to take just a minute?  I know this is

25      difficult for you.

1    A    But I couldn't get out because I had the seat

2         belt on.

3    Q    What happened?

4    A    So I stuck my head out to keep him from shooting

5         me in the head, and I reached back and unbuckled

6         the seat belt where I could slide out.  And I

7         just held onto the seat belt and lowered myself

8         down on the running board and just enough

9         courage, I guess, to just let go, and so I just

10        let go.

11   Q    When was the shot fired?

12   A    Sir?

13   Q    When was the shot fired?

14   A    Before I even got out the car.

15   Q    Before you tried to get out or after you started

16        to get out?

17   A    No, sir, before I even tried to get out.  Before

18        I even knowed it, whenever I saw it over there,

19        it's like a muffled sound, basically.  That's all

20        I could hear.

21   Q    You remember hitting the road then?

22   A    Yes, sir.

23   Q    You remember what happened then?

24   A    I just rolled, just kept rolling.  I can remember

25        hitting my head on the road.

1    Q    Did you lose consciousness?

2    A    No, sir.

3    Q    Did somebody come to your assistance, somebody

4         try to help you?

5    A    It was one guy that was right there following

6         him, I guess, because as soon as I stopped

7         rolling and stood up, I guess he was there.  I

8         mean, he was right there, so I stood up.  And he

9         laid me back down, I guess, and at this time some

10        paramedic and his wife from Atlanta was on their

11        way, I guess, to Florida or somewhere, but they

12        got out and just told me to lay down, that they

13        could help me.  So they laid me back down on the

14        ground.

15   Q    Do you remember being transported to a medical

16        facility?

17   A    Yes, sir.

18   Q    Where were you taken?

19   A    They were talking about trying to take me to

20        Phenix City over here, but he said no, we're just

21        going to take him straight to The Medical Center

22        in Columbus.

23   Q    What happened when you got to The Medical Center?

24   A    They couldn't find the bullet, and so they were

25        scared that they didn't know where it was.  They

1    knew it had exited my arm, went in and exited my

2    arm, but they couldn't find it anywhere in my

3    body, so they thought it was lodged somewhere.

4  Q   Was it found?

5  A   Yes, sir.

6  Q   Where was it found?

7  A   It was lying directly behind my spine and when

8    they took x-rays, they couldn't see it, so they

9    had to roll me over on the side to see it.

10  Q   So this bullet went in where when it struck?

11  A   It went in through my right arm, I mean, left

12    arm, come out and went into my side.

13  Q   You still carry that bullet with you today?

14  A   Yes, sir.

15  Q   How long were you in the hospital, Mr. Jackson?

16  A   One week.  I got out that Friday afternoon.

17  Q   I've got some photographs here and I know they're

18    going to be painful for you to look at it, but I

19    need for you to look at them and tell me if you

20    recognize them.  I've marked them State's

21    Exhibits 2 through 7.  I want you to just look at

22    all of them and just tell me if you recognize

23    those photographs?

24  A   Yes, sir.

25  Q   Were photographs made of you in the hospital?

```
 1   A      Yes, sir.

 2   Q      Are those the photographs?

 3   A      Yes, sir.

 4   Q      Those photographs fairly and accurately depict

 5          the injuries you received on October the -- I'm

 6          sorry, August the 26th of 2000?

 7   A      Yes, sir.

 8              MR. DAVIS:  If it please the Court, we move

 9          to introduce State's Exhibits 2 through 7.

10              THE COURT:  May I see those exhibits,

11          please?

12              MR. DAVIS:  I'm sorry, Judge.

13              THE COURT:  They'll be admitted and

14          received.

15                  (State's Exhibits 2 through 7 were

16                   admitted in evidence.)

17   Q      Can you step down from the witness stand and

18          just --

19              MR. DAVIS:  May I do that, Judge?

20              THE COURT:  Yes.

21   Q      -- and just stand right here.

22                  (Witness complies.)

23   Q      It's a little hard to show the whole jury, so I'm

24          going to try to show this side of the jury and

25          then this side of the jury.
```

40

1           This photograph marked as State's Exhibit 2,

2       do you recognize that photograph?

3   A   Yes, sir.

4   Q   Can you see the place where the bullet exited

5       your arm in this photograph?

6   A   Yes, sir, right here.

7   Q   Can the jury see that?

8               (Jury indicates negatively.)

9   Q   Can you show them once again where the bullet

10      exited your arm?

11  A   Right here.

12  Q   Can you see on here where it entered your side?

13  A   Right there.

14  Q   Okay.  Let's try it on this side, if you would.

15      Once again, where did it exit your arm?

16  A   Right there.

17  Q   And where did it go in your side?

18  A   Right there.

19  Q   You can retake the stand, if you would.

20              (Witness complies.)

21          MR. DAVIS:  If it please the Court, we would

22      like at this time to publish two through seven to

23      the jury.

24          THE COURT:  You may do so.

25          MR. DAVIS:  Would you look at that and pass

41

1      them around, please?

2                (Brief pause.)

3            MR. DAVIS:   Thank you.

4    Q   Let me show you another photograph, Mr. Jackson.

5        It's marked as State's Exhibit 8.   I realize that

6        most white Lincoln Navigators look alike, but

7        does that look like the automobile the Defendant

8        was test-driving the day he shot you?

9    A   That's correct, yes, sir.

10   Q   The police come and talk to you at The Medical

11       Center?

12   A   Yes, sir.

13   Q   Did you try to describe this guy and give them

14       the information that he had given you?

15   A   Yes, sir.

16   Q   Do you know Bryant Harris?

17   A   Yes, sir.

18   Q   Who is Bryant Harris?

19   A   One of my co-workers.

20   Q   Did he work with you at Gateway?

21   A   Yes, he did, sir.

22   Q   Was he there on August the 26th?

23   A   Yes, sir.

24   Q   Did he have an occasion to meet the Defendant?

25   A   Yeah.  He's my partner, so yes, sir, when I can't

```
 1        get to a customer, your partner always kind of
 2        helps if they can.
 3    Q   Y'all also sort of friends?
 4    A   Yes, sir.
 5    Q   Does he now work at the same place you work?
 6    A   Yes, sir.
 7    Q   You know where Peachtree Mall is, don't you?
 8    A   Yes, sir.
 9    Q   Been there before?
10    A   Yes, sir.
11    Q   Many times?
12    A   Yes, sir.
13    Q   October the 19th, a month-and-a-half or something
14        like that later, were you at Peachtree Mall?
15    A   Yes, sir.
16    Q   Something happen out there?
17    A   Yes, sir.
18    Q   What happened?
19    A   Bryant and I -- Bryant came by my home and said
20        that he was going to the mall and he'd like for
21        me to ride with him, and I was still injured at
22        the time and he'd help me drive sometimes, so he
23        invited me to go to the mall, and I did.  And we
24        come in through --
25    Q   By the way, were you working at that time, or
```

```
 1            were you still --

 2     A      No, sir, I was still out.  And we decided to go

 3            to the mall.  I needed to buy a tie for that

 4            Sunday for church, so we went into Parisian's and

 5            bought a couple of things.  And he wanted to show

 6            me this girl in the music store, so we proceeded

 7            to go out of Parisian's to, I guess, Camelot or

 8            something up in the middle of the mall.

 9     Q      What happened?

10     A      As we were walking, Bryant grabbed me.  He said

11            DJ, he said, that's the guy right there that shot

12            you, right there.  And when he --

13     Q      When he said that, when Bryant Harris said that,

14            what did you do?

15     A      I turned to look and see who he was pointing at.

16     Q      What did you see?

17     A      Yeah, I saw the Defendant.

18     Q      The man who shot you?

19     A      Yes, sir.

20     Q      Does he look today the way he did that day?

21     A      No, sir.

22     Q      How has he changed?

23     A      His hair was longer, more or less of a process.

24            He had his beard, had long sideburns.  He had a

25            rag over the top of his head hanging down tied,
```

```
 1              and he was in all black.

 2    Q    As soon as you saw him, you recognized him?

 3    A    Oh, yes, sir.

 4    Q    What did you do?

 5    A    He recognized me.  We recognized each other right

 6         away.

 7    Q    In other words, the Defendant looked at you?

 8    A    Oh, yes, sir.

 9    Q    Made eye contact?

10    A    Yes, sir.

11    Q    What happened?

12    A    I tried to hide at first because I didn't know if

13         he still had the gun or anything.  He was with

14         two other guys, I believe.  And I tried to get

15         into one of the stores and look and see what he

16         was doing, but immediately Bryant had his phone

17         on him and he said that's him, I know that's

18         him.  And I said yeah, but don't run up on him

19         because he may do -- he may shoot you or

20         something like that.

21              Well, he wind up easing out Parisian's,

22         going out Parisian's, and Bryant immediately got

23         on the phone.  And I waited for a few minutes and

24         I didn't know what he was going to do, so I went

25         to the front entrance of the mall, and he came
```

1    out in Parisian end and started coming back up to

2    the main entrance, this gentleman, and I didn't

3    know if he still had a gun or what and Bryant, I

4    didn't know how far he was behind him, so I

5    immediately went to get to a phone to call the

6    police.  I don't know what Bryant was doing in

7    Parisian's.  I know that he was on his phone.

8         Well, they wouldn't let me use the phone, so

9    they directed me to an officer, security officer.

10   Q    A mall security officer?

11   A    Yes, sir.  And so he didn't have a gun or

12   anything on him, and I was trying to explain to

13   him, so basically we all came outside and I

14   stayed with him and then.

15   Q    You stayed with the mall security officer?

16   A    Yes, I did.  And then the security woman that's

17   over security, head lady, she came out and we

18   were standing outside and I asked her, I said

19   listen, if you could, can I go somewhere because

20   I don't want to be standing outside, and that's

21   when Bryant recognized him running.  And so

22   immediately --

23   Q    Running where?

24   A    He was running out like on the end --

25        MR. POPE:  Objection, Your Honor.  He's not

1      testifying that he saw him running.  He's

2      testifying that somebody else saw him running.

3  A   No, I eventually saw him running.

4  Q   Okay.

5       THE COURT:  All right.

6  A   So Bryant was saying there he is, there he is,

7      he's running, and so everybody turned and there

8      he was.  He was running.

9  Q   Running where?

10  A   He was running towards Montgomery Wards, like he

11      was running towards the Krystal, between Katz and

12      the bank and Krystal.

13  Q   What happened then, Mr. Jackson?

14  A   Sir?

15  Q   What happened then?

16  A   Then the security guard just took off in his car

17      and come up behind him, so Bryant and I kept

18      running to make sure, hopefully, that if he

19      didn't get away, that we could recognize him.

20  Q   And where did you go?

21  A   He finally stopped running, and the security

22      guard told him to stop.  He just kept saying

23      what, what did I do.  And we walked up to him

24      close enough, they wouldn't let us get too close,

25      and Bryant and I said that's him, that is him.

|   |   |
|---|---|
| 1 | So they checked him and put him in the security |
| 2 | truck. |
| 3 | Q  The vehicle that the Defendant, Avery Griggs, was |
| 4 | driving that day when he shot you, did you ever |
| 5 | see that vehicle again? |
| 6 | A  No, sir.  No, sir, I did not. |
| 7 | Q  You do know that it was later recovered, but you |
| 8 | didn't see it? |
| 9 | A  Yes, sir.  No, sir, I didn't. |
| 10 | Q  Let me show you what's marked as State's Exhibit |
| 11 | 9.  I'd ask you to look at it, and tell us if you |
| 12 | recognize that, Mr. Jackson? |
| 13 | A  Yes, sir. |
| 14 | Q  What is it? |
| 15 | A  That's my business card. |
| 16 | Q  Is that like the card you gave the Defendant on |
| 17 | the day that he shot you? |
| 18 | A  Yes, sir. |
| 19 |     MR. DAVIS:  If it please the Court, we move |
| 20 | to introduce State's Exhibit 9. |
| 21 |     THE COURT:  Be admitted and received. |
| 22 |         (State's Exhibit 9 was admitted in |
| 23 |          evidence.) |
| 24 |     MR. DAVIS:  Ask to publish it to the jury. |
| 25 | Q  Thank you, Mr. Jackson. |

1          MR. DAVIS:   The witness is with you, Mr.

2      Pope.

3          MR. POPE:   Thank you, Mr. Davis.

4                    CROSS-EXAMINATION

5  BY MR. POPE:

6  Q    Mr. Jackson, what's the busiest day that you have

7      to sell cars?   When do more people show up to buy

8      or look at automobiles during the week?

9  A    Sometimes Fridays, sometimes.

10 Q    Sometimes Fridays?

11 A    Sometimes Saturdays.   It just really depends.

12 Q    So it varies from week to week?

13 A    Depends on advertising.

14 Q    On August the 26th, on Saturday, how many people

15     did you talk with about an automobile?

16 A    Three or four.

17 Q    Three or four?

18 A    Uh-huh (positive response).

19 Q    And you've been -- you testified that you've been

20     at Gateway Lincoln-Mercury about nine years?

21 A    Close to it.

22 Q    Over that nine-year period, did you sell a lot of

23     cars?

24 A    Yes, sir.

25 Q    Met a lot of people doing that?

1   A   Yes.

2   Q   How many times -- well, strike that.  When you

3       talk with somebody about a car, is it your normal

4       practice to hand them a business card?

5   A   Not everybody.

6   Q   Not everybody?

7   A   No, sir.

8   Q   Just those people that you think will be

9       interested in buying a car?

10  A   Well, you have a sales process that you qualify a

11      customer.

12  Q   What is that process?

13  A   Basically, you ask them where they work, where

14      they're getting their money from or what their

15      previous credit look like.

16  Q   And when you do that, they respond to that and

17      tell you?

18  A   Basically, yes.

19  Q   Then you kind of get a feel if they're serious

20      about it?

21  A   That's right.

22  Q   Do you have a way of checking that?

23  A   What do you mean?

24  Q   Well, do you have a way to check their truth

25      towards giving you that information?

1    A    Final results.  The final results, if they

2         purchase a car or not.  That's the only way that

3         you can verify or find out.

4    Q    Yes, sir.  I think you testified that you TOD'd,

5         you have to TOD?

6    A    It's called a TO.

7    Q    TO?

8    A    Turnover.  Basically, a customer, a person cannot

9         leave the dealership without having talked to a

10        manager.  If not, you get fined $25.

11   Q    So if I go into the dealership and I look at an

12        automobile and you speak with me, before I can

13        leave, you need to get me in front of a manager?

14   A    I'm supposed to.  It's not always the case, but

15        we're supposed to.

16   Q    How many automobiles have you sold over nine

17        years at Gateway Lincoln-Mercury?

18   A    Hundreds, thousands.

19   Q    How many people do you think you've talked to

20        during that time?

21   A    Probably double, triple that.

22   Q    So you think thousands of people you've talked to

23        at some point in time?

24   A    Sure.

25   Q    You testified that the person -- when you

51

```
 1        testified that the Defendant, when he came in and

 2        talked with you about this Lincoln Navigator, he

 3        gave the name of Avery Thomas or Al Thomas?

 4    A   It's written down what he -- it's Al Thomas.  I

 5        can't remember back then, but I wrote down

 6        specifically what he told me, he told me he was.

 7    Q   So he told you, and I believe it's Al Thomas is

 8        what you remember?  I think it's on State's

 9        Exhibit 1.  Is this the name in which he had told

10        you?

11    A   That's correct.

12    Q   And what is that name?

13    A   That's Al Thomas.

14    Q   At any other time did he give you any other name?

15    A   No, sir.

16    Q   I'm just trying to clarify this.  You said that

17        the Defendant came the first time and spoke with

18        you about the Lincoln Navigator?

19    A   That's correct.

20    Q   And then he leaves?

21    A   That's correct.

22    Q   Did he go inside Gateway?

23    A   Yes, he did.

24    Q   And he spoke with who?

25    A   A manager, Randy Lavoie.
```

52

| | | |
|---|---|---|
| 1 | Q | He spoke with the manager? |
| 2 | A | That's correct. |
| 3 | Q | Did he fill out any paperwork? |
| 4 | A | No, sir, he -- no, sir. |
| 5 | Q | Again, I go back to State's Exhibit 1.  He didn't |
| 6 | | fill this out on the first visit then? |
| 7 | A | I filled this out. |
| 8 | Q | You filled this out? |
| 9 | A | That's correct. |
| 10 | Q | Did he -- did you ever see him once he went |
| 11 | | inside there? |
| 12 | A | Yes, sir. |
| 13 | Q | Where did you see him inside there? |
| 14 | A | I had to deliver him to the business office. |
| 15 | Q | And where -- when you delivered him, did he sit |
| 16 | | down? |
| 17 | A | Yes, he did. |
| 18 | Q | He did sit down? |
| 19 | A | Yes, he did. |
| 20 | Q | And did he speak with anybody? |
| 21 | A | Yes, he did. |
| 22 | Q | Did he touch anything? |
| 23 | A | No, sir, he did not.  He sat there.  Well, not as |
| 24 | | I know of, but I know he didn't sign anything. |
| 25 | | He just sat in the chair. |

53

| | | |
|---|---|---|
| 1 | Q | Was he wearing gloves? |
| 2 | A | No, sir. |
| 3 | Q | It wasn't a cold day.  It was August; right? |
| 4 | A | (Witness nods head affirmatively.) |
| 5 | Q | Okay.  So he leaves the dealership and then he |
| 6 | | comes back? |
| 7 | A | Yes, sir. |
| 8 | Q | And I think you testified that he -- that you |
| 9 | | were busy at the time speaking with another |
| 10 | | customer? |
| 11 | A | Two other customers. |
| 12 | Q | Two other customers.  What did he do between the |
| 13 | | time that he arrived there the second time and |
| 14 | | the time that you were freed up to speak with |
| 15 | | him? |
| 16 | A | He was given the keys and went to the car.  He |
| 17 | | was actually in the Navigator during that whole |
| 18 | | process. |
| 19 | Q | So he had the keys? |
| 20 | A | Yes, sir. |
| 21 | Q | And he was inside? |
| 22 | A | Yes, sir. |
| 23 | Q | He was looking around? |
| 24 | A | That's right. |
| 25 | Q | And did you see him out there doing those things? |

54

1   A   Well, I'm not for sure if I gave him the keys or

2       Bryant gave him the keys, but I did go get the

3       keys off my desk so that he can get in, and I did

4       tell him that I'll get with him as soon as I

5       finish.

6   Q   How long was he out there?

7   A   15, 20 minutes.  Maybe more.  Just really

8       depending on what I had to do with my customer

9       that I would finish up.

10  Q   Did you sell that car to the customer that you

11      were talking to?

12  A   I sure did.

13  Q   You did?

14  A   Yes, sir.

15  Q   So you sold that automobile to those two

16      customers or a customer and then you went and

17      processed them and got them out; is that correct?

18  A   No, sir.  No, sir.  They were sold.  She was

19      going to AFLAC.  She's a previous customer of

20      mine.  She was going to AFLAC to get her check

21      that Monday morning, so I've sold her cars

22      before, so that deal was closed.  It was sold.

23      They just had to bring a check, so they were

24      gone.  They left and took it home.

25  Q   So it was a cash deal?

1   A   Yes, sir.

2   Q   How many vehicles did you sell that day; do you

3       remember?

4   A   Two.  Well, no, one because basically I didn't

5       sell that one.

6   Q   You sold one vehicle that day?

7   A   Right, but I never did get a chance to complete

8       the paperwork.  Bryant finished it for me, I

9       guess, the next Monday.

10  Q   And you saw three or four customers that day?

11  A   Including him.

12  Q   Once you were freed up with them and you sold

13      that vehicle, then you came out and met with the

14      Defendant?

15  A   That's correct.

16  Q   That's what you're testifying?  And then y'all

17      test-drove that vehicle?

18  A   That's correct.

19  Q   Did you go directly to the Navigator?  Did y'all

20      get in the vehicle and leave?

21  A   He was already in the Navigator.  Once I freed

22      myself up with the customer, I went to the

23      Navigator at that time because he had already

24      been sitting in there.

25  Q   So in order for me or any individual to

1   test-drive a vehicle at Gateway, we just had to

2   show up and we get to test-drive a vehicle?

3 A If you're accompanied with a salesperson.

4 Q And I think you testified that they tried to run

5   a credit check on him?

6 A They wanted to try to finance him there.  That

7   was their job.  That's what the purpose of the TO

8   was for -- is to see if we could get in-house

9   business.

10 Q And if somebody doesn't want you to run a credit

11   check on them, that's not necessarily barring

12   them from test-driving?

13 A No, sir.

14 Q That doesn't raise a red flag when somebody

15   says --

16 A No, sir.  No, sir.  A lot of people write checks,

17   stroke checks.

18 Q What was the Defendant wearing that day; do you

19   remember?

20 A Khaki pants and a printed shirt.

21 Q Printed shirt.  Colors?

22 A Brown, multi-colored dark brown.  It was just a

23   multi-colored shirt.  That's from my best

24   recollection of the color of the shirt.  He was

25   definitely wearing khaki pants.

57

```
 1    Q    When y'all went to get gas --

 2    A    That's correct.

 3    Q    -- as you testified earlier, did he get out of

 4         the car at any point in time?

 5    A    No, sir.

 6    Q    He stayed inside?

 7    A    That's right.

 8    Q    Did he have the keys --

 9    A    Yes, sir.

10    Q    -- to the automobile at the time?

11    A    Yes, sir.

12    Q    And would y'all listen to his music when y'all

13         were in there?

14    A    Yes, sir.

15    Q    And you said that that was CDs?

16    A    Yes, sir.

17    Q    Those were compact discs?

18    A    I'm sure it was.  That's what he told me.

19    Q    Now, when you were going down 431 South and he

20         was increasing speed and you looked over, did you

21         testify that you looked over and saw the gun?

22    A    No, sir.

23    Q    How did you first see the gun?

24    A    After I told him to turn at 165 to go back and

25         finish up the paperwork, when I looked back down,
```

1        that's when I saw the gun.

2    Q   And I think you testified that you saw the gun

3        laying across the armrest?

4    A   So to speak.  I don't know how far it was across

5        the armrest, but it was up against the armrest

6        down on the -- in the middle of the console.

7    Q   Yes, sir.  Do you remember giving a statement to

8        Sergeant Lawrence in this case?

9    A   Sergeant Lawrence?

10   Q   Is that not -- you remember a Sergeant Lawrence?

11   A   It was an older taller white guy, --

12   Q   Ricky Lawrence?

13   A   -- a black guy, and then some other guys that

14       came in, so I don't know anyone by name at that

15       point.

16   Q   How about a Lieutenant McGarr?

17   A   I'd have to see their picture, sir.  I don't know

18       them by name.

19   Q   Well, in their statement that they took down and

20       they say this is your statement, they said that

21       you told them that you saw him reach over to his

22       left and remove a gun and then produce it?

23   A   No, sir.

24   Q   You didn't say that earlier?

25   A   What I told them was is I don't know if he

59

```
 1        reached -- I don't know if he reached over and
 2        grabbed the gun, but I said I know that it was on
 3        the armrest whenever he shot me.  I did not say
 4        that that's exactly where he got it from.  I
 5        don't know how he got it because it was on the
 6        rest, but he had to have gotten it from somewhere
 7        in that vicinity.  But I did not say that he did
 8        that.
 9   Q    Do you know what kind of gun it was?
10   A    I know the color of it.  I'm pretty close to --
11        I've seen enough to know that I'm pretty sure
12        what it was.
13   Q    Did you tell them it was a nickel-plated nine
14        millimeter --
15   A    It was a silver chrome nine looking millimeter
16        with a black handle.
17   Q    You made some statements, forgive me, but you
18        made some statements to the individuals that
19        helped you on the side of the road after you left
20        the vehicle; right?  Do you remember making any
21        statements to them?
22   A    I remember telling them that I was shot and I
23        remember telling them who shot me and I remember
24        telling them what they were driving, but I had
25        rolled a hundred and something yards.  I don't
```

1      know.

2   Q   Do you ever remember telling them that you were

3      shot while trying to get out of the vehicle?

4   A   No, sir.

5   Q   Do you remember talking to either one of these;

6      Daniel Brown?

7   A   I don't know any names.  I don't know any names.

8   Q   I mean, I know it took place after a very

9      traumatic experience.  I'm just trying to figure

10     out.  I've got two people that talked to you

11     since, and both of them made the statement that

12     you told them --

13     MR. DAVIS:  Judge, I'm just going to object

14     to Mr. Pope testifying.  If he has a statement

15     that he wants to introduce, I don't have any

16     objection to it.

17     MR. POPE:  I'll withdraw that statement,

18     that question.

19     THE COURT:  All right.

20   Q   So it's your testimony here today that you never

21     spoke with any individuals that you were actually

22     trying to leave the vehicle and then he shot you?

23   A   No, sir.

24   Q   When you were taken to the hospital, did they run

25     a CAT scan on you?

1    A    Later.  Later on that night.

2    Q    They did?  And that was because you had hit your

3         head; right?

4    A    Well, basically, --

5    Q    I mean, that's the reason why?

6    A    -- they checked my hip and they checked my chest

7         because I was having some pains in my chest,

8         too.  They didn't know if there was anything

9         broken there or not.

10   Q    Did the individual that was driving that did this

11        to you, did he have gloves on?

12   A    No, sir.

13   Q    Did he touch anything inside the vehicle?

14   A    I'm sure he did.

15   Q    Did he touch anything on the outside of the

16        vehicle?

17   A    I'm sure he did.

18   Q    Did he have a hat on?

19   A    No, sir.

20   Q    When y'all were at Peachtree Mall, you testified

21        that Bryant Harris was the first one to identify

22        him?

23   A    That's correct.

24   Q    And he told you that's the guy that did this to

25        you?

| | | |
|---|---|---|
| 1 | A | He recognized who he was before I ever saw him. |
| 2 | Q | Have you ever seen the Defendant, other than what |
| 3 | | you're testifying to here today, prior to August |
| 4 | | the 26th, 2000? |
| 5 | A | I told the detectives I had seen him somewhere. |
| 6 | | I did not know where.  I had. |
| 7 | Q | Is it possible that you could have seen him at |
| 8 | | the car dealership? |
| 9 | A | No, sir. |
| 10 | Q | It's not possible? |
| 11 | A | No, sir. |
| 12 | Q | It's not possible that he could have bought an |
| 13 | | automobile from you? |
| 14 | A | No, sir, not possible. |
| 15 | Q | But you do remember him from somewhere? |
| 16 | A | That's correct. |
| 17 | | MR. POPE:  I have no further questions, Your |
| 18 | | Honor. |
| 19 | | THE COURT:  Mr. Davis, do you have anything |
| 20 | | further? |
| 21 | | REDIRECT EXAMINATION |
| 22 | | BY MR. DAVIS: |
| 23 | Q | Mr. Jackson, in all the years that you have been |
| 24 | | in the sales business, been a salesman, I guess |
| 25 | | you have seen, talked to thousands of people; |

```
 1        have you not?
 2   A    Yes, sir.
 3   Q    Sold hundreds of cars?
 4   A    Yes, sir.
 5   Q    How many people have you ever sold a car to who
 6        shot you and left you on the roadway to die?
 7   A    None.
 8   Q    Other than the Defendant?
 9   A    That's correct.
10   Q    Thank you.
11             THE COURT:  Anything further, Mr. Pope?
12             MR. POPE:  No further questions, Your Honor.
13             THE COURT:  Who's the State's next witness?
14             MR. DAVIS:  Call Jesse McKinnon.
15                        JESSE MCKINNON
16          was sworn and testified as follows:
17                      DIRECT EXAMINATION
18   BY MR. DAVIS:
19   Q    Tell us your name, please?
20   A    Jesse McKinnon.
21   Q    Mr. McKinnon, your voice is a little small and
22        the acoustics are not great in here.  Can you
23        speak up a little bit for me?
24   A    Jesse McKinnon.
25   Q    Where do you live?
```

1   A   Right now I live off Hamilton Road in some

2       apartments.

3   Q   How long have you lived there?

4   A   I think about six months now.

5   Q   Where do you work?

6   A   At Perfect Patterns South.

7   Q   How long have you worked there?

8   A   I'm on my 11th month right now.

9   Q   Back on August of 2000, Mr. McKinnon, did you

10      have occasion to be driving an automobile or a

11      truck of some kind down on U.S. 431?

12   A   Right.

13   Q   Do you remember what time of day it was?

14   A   No, sir.

15   Q   Was it afternoon?

16   A   I really -- I don't know.  I'm not positive.

17   Q   Do you remember where you were going?

18   A   Yeah.  I was going to my mom's house.

19   Q   Where does your mother live?

20   A   She lived right off 431 when you go past the

21      college and take a right on Ware Road.  It's

22      about two miles past the college on the right.

23   Q   So you were going to her house?

24   A   Yes.

25   Q   Had you worked that day?

```
1    A    No.

2    Q    Were you in a truck or a car or what?

3    A    I was in my truck.

4    Q    Anything unusual happen?

5    A    On the way up there?

6    Q    Well, when you were on 431.  Did you see anything

7         unusual, anything attract your attention that

8         day?

9    A    What had happened when that Navigator come by me.

10   Q    Tell the jury about that, what did you see?

11   A    I was going down the road, I was riding down in

12        the road and I noticed in my rearview mirror, I

13        seen him coming up on me and he was coming pretty

14        quick, and he was in the lane I was in and he

15        swerved over.

16   Q    When you say he, you're just talking about a car

17        that was coming up behind you?

18   A    Right.

19   Q    You didn't know who was in that vehicle?

20   A    No, sir.

21   Q    Continue.

22   A    The car was behind me, and they got over to pass

23        me and when they got over, they shot by me pretty

24        quick and they got back in front of me.  And we

25        went just a little ways, and then I seen the
```

```
 1        passenger's door open and that man right there
 2        leaned out and he looked at me.  It looked like
 3        he was saying something to me.  I didn't know if
 4        they were just cutting up or saying something,
 5        you know, just messing around.
 6    Q   How fast were you going at that time, Mr.
 7        McKinnon?
 8    A   I was doing 70.
 9    Q   And this car, this Lincoln Navigator that was in
10        front of you, it was going faster than that, I
11        take it?
12    A   Yes, sir.  They were a pretty good ways in front
13        of me.
14    Q   Okay.  What happened after you saw the man open
15        the door?
16    A   He looked at me and said something, and I didn't
17        know if they were just cutting up or playing
18        around, and the door shut again.  And then it
19        opened up the second time and I seen him, he was
20        trying to get his seat belt off his neck.  And he
21        kept on hanging out trying to fight to get the
22        seat belt off and then when he got it off, it
23        looked like his head hit the ground.  And when it
24        hit the ground, it snatched him out the car and
25        he started rolling, and I hit the brakes.  And he
```

1    was still in front of me rolling, and I stayed in

2    my lane because he was in that lane.

3  Q   Was he in the roadway rolling in front of your

4    vehicle or on the side of the road?

5  A   No.  He was still in front of me rolling, and

6    there wasn't any more cars around me that I could

7    see, so I hit the brakes and I stayed in that

8    lane.  When he stopped, I pulled over to the side

9    of the road.

10  Q   When you say that lane, would that have been the

11    outside lane or the inside lane?

12  A   The outside.

13  Q   Okay.  What happened when you stopped?

14  A   I got out and I walked over to him and he looked

15    at me, and I told him we need to get you up and

16    get you out of the road.  And he stood up, and I

17    kind of like walked him over to my truck and I

18    leaned him up against my truck, and then he told

19    me that he couldn't stand up.  So I took him back

20    behind my truck and I laid him down, and that's

21    when I grabbed my phone and called the police.

22  Q   Had you ever seen that man before, the man you

23    helped that day?

24  A   No, sir.

25  Q   The Navigator, where did it go?

1  A    I really didn't see too much.  Once he hit the

2       ground, I was hitting the brakes watching him,

3       and I watched him keep on going down the road a

4       little ways and that was the last I seen of them.

5  Q    You say them.  Was there more than one person in

6       the Navigator, or do you know how many people

7       were in it?

8  A    Well, I know when he got in front of me, I seen

9       the driver and I knew there was a passenger, and

10      I couldn't -- I couldn't tell if there was

11      somebody in the backseat or not, so I wasn't

12      positive.

13 Q    You didn't see the Navigator again after that?

14 A    No.

15 Q    Did you wait there until the police came?

16 A    Yes.

17 Q    And did an ambulance come?

18 A    Yes.

19 Q    Did you speak with Mr. Jackson here while you

20      were there waiting?  Did you talk to him, did he

21      talk to you?

22 A    He talked to me a little bit.  He couldn't say

23      too much.

24 Q    Do you remember what he told you?

25 A    He did tell me that he had been shot, that

```
 1        somebody shot him, and that's really all I got

 2        out of him.  He just laid there a little while.

 3   Q    Okay.  You didn't know him --

 4   A    No.

 5   Q    -- before that day?  Thank you, Mr. McKinnon.

 6            MR.  DAVIS:  The witness is with you, Mr.

 7        Pope.

 8            MR. POPE:  Thank you, Mr. Davis.

 9                    CROSS-EXAMINATION

10   BY MR. POPE:

11   Q    Mr. McKinnon, did you speak with a police officer

12        after this?

13   A    Right.

14   Q    Did you tell the police officer that the driver

15        shot me -- that the victim told you that the

16        driver shot me while I was trying to get out of

17        the truck?  Do you remember a statement like

18        that?

19   A    I just remember telling him that he told me that

20        the man shot him, that he was shot.

21   Q    Do you remember a statement that you made or that

22        you might have made -- this is in a report made

23        by a police officer -- that you might have seen

24        more than the driver in that vehicle?

25   A    Right.
```

1    Q    You stated that there might be a third person?

2    A    I didn't know.  The way I was looking at it, I

3         was just trying to pay attention what was

4         happening, but it seemed like to me there was

5         another person in the backseat.  I wasn't

6         positive.

7              MR. POPE:  No further questions.

8              MR. DAVIS:  Thank you, Mr. McKinnon.  We

9         appreciate you coming today.  Judge, we'd ask

10        that he be excused.

11             THE COURT:  He may be excused.  Thank you.

12        Who's your next witness?

13             MR. DAVIS:  We call Bryant Harris.  Thank

14        you, Mr. McKinnon.

15                  (Brief pause.)

16                   BRYANT HARRIS

17          was sworn and testified as follows:

18                 DIRECT EXAMINATION

19   BY MR. DAVIS:

20    Q    Tell us your name, please?

21    A    Bryant Keith Harris.

22    Q    Mr. Harris, where do you live?

23    A    2729 Mimosa Street in Columbus, Georgia.

24    Q    How long have you lived there?

25    A    26 years, 27 years.

1    Q    A long time?

2    A    Yes.

3    Q    Where do you work?

4    A    Rivertown Ford, car salesman.

5    Q    How long have you worked there?

6    A    February 22nd, I think, of this year was my first

7         day, so about nine months.

8    Q    You know Mr. Jackson here?

9    A    Yes.

10   Q    How long have you known Mr. Jackson?

11   A    Oh, I've known him maybe five, six years, but I

12        became good friends with him when I started at

13        Gateway January the 3rd of 2000.

14   Q    So in January you went to work at Gateway?

15   A    Yes.

16   Q    And were you a salesman there, too?

17   A    Yes, sir.

18   Q    Mr. Jackson was a salesman there?

19   A    Yes.  He taught me what I know.

20   Q    You a good car salesman?

21   A    I would like to think so.

22   Q    August the 26th of 2000, were you working that

23        day?

24   A    Yes, sir, I was.

25   Q    And was Mr. Jackson working that day?

1    A    Yes, sir, he was.

2    Q    Are you familiar with a white Lincoln Navigator

3         that was on the lot at Gateway at that time?

4    A    Yes.  Yes, sir.

5    Q    Did you see somebody that day that was interested

6         in that Navigator?

7    A    Yes, sir, I did.

8    Q    Did you know that person?

9    A    I didn't know him, but I saw him twice.  He came

10        in twice that day.

11   Q    Do you remember what time of day it was when you

12        first saw him?

13   A    The first time I guess it was, I guess around

14        one, twoish, and then it was a few hours after

15        that he came back.

16   Q    Where was this?

17   A    In the showroom.  In the Isuzu showroom.

18   Q    Was he with somebody or alone?

19   A    No, he was by himself.

20   Q    Did you talk to him?

21   A    No, sir.

22   Q    Did you see him again that day?

23   A    Yes.  Saw him twice that day.  Came in twice.

24   Q    So you saw him later?

25   A    Within a few hours had passed between the first

1        and second time.

2  Q    When you saw him that second time, was he with

3        somebody or alone?

4  A    I didn't see anybody with him then either.

5  Q    Did you ever see Mr. Jackson talking to him?

6  A    Yes, I did.

7  Q    Tell us what you saw that second time.

8  A    I think the second time he came in, I had a

9        customer, and my office and Mr. Jackson's office

10        were right across the hall from each other, so I

11        mean, it's quite obvious when somebody comes in,

12        you're going to walk outside your office from

13        time to time and just see what's going on and

14        notice your surroundings.  But I noticed that he

15        came in the second time.  The first time he came

16        in, DJ asked if he could get somebody for him,

17        and he said no, I just want you to work with me,

18        period.

19  Q    You who?

20  A    You being Mr. Jackson.

21  Q    I see.

22  A    I don't want you to get any help for me, you

23        know, because that's what we do as car salesmen.

24        If we can't help them, then we get our partner

25        for you or whatever the case may be.  But he

```
 1        didn't want a partner's assistance, and that's

 2        about all I remember.

 3   Q    And that second time you saw him with Mr.

 4        Jackson, and did you see him speak with anybody

 5        else?

 6   A    No, sir.

 7   Q    Did you see him leave the car dealership?

 8   A    I didn't see him leave either.

 9   Q    Did you later that day discover that your friend,

10        Mr. Jackson, had been shot?

11   A    Yes, sir.

12   Q    How did you make that discovery?

13   A    We were inside the Lincoln showroom, which is the

14        big showroom, and we were all just sitting around

15        talking, and then I think the police called the

16        general manager there and he notified us and told

17        us.

18   Q    Do you know Randy Lavoie?

19   A    Yes.  He was the finance manager at that time.

20   Q    What did you do when you found out that Mr.

21        Jackson had been shot?

22   A    Well, first we wanted to find out how he was

23        doing and where he was.  We noticed -- I mean,

24        they told us that he was being taken care of and

25        taken to the hospital, and I called his family
```

1     and notified them and let them know where he was.

2  Q   Did you go to the hospital?

3  A   Yes, sir.

4  Q   Sometime after that; in fact, the 19th of

5     October, did you have occasion to be at Peachtree

6     Mall with Mr. Jackson?

7  A   Yes, sir.

8  Q   How did that come about?

9  A   I would go by and see him maybe three, four days

10    a week at his house.

11  Q   Mr. Jackson still wasn't working at that time?

12  A   That's correct.

13  Q   You were still working at Gateway?

14  A   That's correct.

15  Q   Okay.

16  A   It was my off day and, I mean, I shop a lot, and

17    I was just going by to visit him and see how he

18    was doing that day.  I said well, I'm going to

19    the mall.  I said do you want to go, and I didn't

20    expect him to say yes.  He had turned me down so

21    many times before, but he said yeah, I got to go

22    back home and preach or something.  He had some

23    kind of church thing that he had to do that

24    weekend and he needed to go get a tie, so he said

25    yeah.  And normally when I go to the mall, I

1    mean, even if I'm going to Ruby Tuesday's, I'll

2    park at Parisian's and just walk all the way down

3    there, and that's what I did that day.

4         I asked him, I said well, do you want to go

5    to Parisian's or Dillard's first.  He said it

6    doesn't matter.  Let's go to Parisian's.  So we

7    went in through Parisian's.  We're shopping just

8    a little bit, and he grabbed what he needed and

9    he was like come on, let's go.  I said come on,

10    and we walked on out, and we're walking through

11    Parisian's headed to the food court.  There's a

12    little aisle for like wheelchair people and then

13    there's two sides on the side of it.  We walked

14    up the aisle and we got right there where the ear

15    piercing place is, the piercing.  Pagoda, I

16    think, is the name of it.

17    Q    That's very close to the exit, isn't it?

18    A    Sir?

19    Q    That's very close to the exit, isn't it, or is

20         it?

21    A    Which exit are we talking about?

22    Q    The main exit.  Or am I thinking about another

23         place?

24    A    This is right in front of the food -- no, it's

25         not on that side of the food court.  It's on the

```
 1          other side of the food court.

 2    Q     The other end of the food court?

 3    A     Right.  By Journeys and all those little small

 4          shops.

 5    Q     I think I've got that confused with the place

 6          where you get your nails done.

 7    A     No, no, no, not that place.  This is the ear

 8          piercing place.

 9    Q     Okay.  What happened then?  I'm confusing you.

10          What happened then?

11    A     Something just told me to look to my right, and

12          Demetrius was to my left and he didn't notice

13          that I had stopped, and I stopped and I turned

14          and I looked, and he looked me dead in the face.

15    Q     He who?

16    A     Mr. Avery Griggs.

17    Q     That man right there?

18    A     Yes, sir.

19    Q     Is that the man you saw come in Gateway first

20          that day?

21    A     Yes, sir.

22    Q     And then come in a second time?

23    A     Yes, sir.

24    Q     Okay.

25    A     And, I mean, we stared each other down for it had
```

1    to be -- well, it seemed like a minute.  It could

2    have been five seconds.  But he looked at me and

3    I looked at him, and he had two other guys with

4    him.  And like I said, Demetrius didn't know I

5    had stopped, and he was getting ready to hook a

6    left like he was going toward Structure in the

7    mall, and I hollered for him to come back.  And

8    he came back, and I pointed to Mr. Griggs and I

9    said that's the guy that shot you, there.  And

10   I'm still looking at Mr. Griggs and when I look

11   up again, DJ is looking at me.  He's like that's

12   him, that's him.  And like I said, he had two

13   other guys with him and I caught the tail end of

14   the conversation, and the only word I heard was

15   Parisian's.  So I saw him walking --

16   Q   Tail end of the conversation between these three

17       people?

18   A   Between him and the two guys, yes.  And I heard

19       him say Parisian's, so I stood there.  I didn't

20       know if he had any weapons or anything on him, so

21       I just stood there.  And I followed him through

22       Parisian's, and I told the girl that I knew at

23       the counter, I said get mall security out here

24       now.  And by the time -- we went the right way

25       towards the Montgomery Ward parking lot, that big

1    parking lot on the right-hand side of Parisian's,

2    and that's the door that we exited, and he was

3    walking in between the cars.  And by the time I

4    got outside, there's a black lady, I think she's

5    head of security for Parisian's, and then I was

6    talking to a mall security guard and we were

7    talking and I told him, I said look, he just went

8    in that door there.  He could run all the way

9    down and go through J.C. Penney's, he could jump

10   the back and be at the airport runway, or he

11   could -- but before I got all of that out of my

12   mouth, he took off running towards the recruiting

13   station and that little bank and the Krystal and

14   all that.

15   Q    Is that over towards where the Krystal is?

16   A    Yes.

17   Q    Running across the parking lot?

18   A    Yes.

19   Q    And you could see him?

20   A    Yes.

21   Q    What happened?

22   A    Well, we gave chase and -- I mean, he had all

23        black on that day.  Black shoes, socks, shirts,

24        black skull cap thing, doo rag.

25   Q    When you look at him today, when you look at

1    Avery Griggs today, does he look the same way he
2    did that day?
3  A    He's altered his appearance a little bit.
4  Q    He's cut his hair?
5  A    He's cut his hair.  He had sideburns then.  He's
6    altered the sideburns.
7  Q    He's changed his appearance, but that's him;
8    right?
9  A    Without a doubt.
10  Q    Did mall security catch up with him?
11  A    Yes, they did.
12  Q    Did they hold him until the police got there?
13  A    Yes.
14  Q    Thank you, Mr. Harris.  Mr. Pope right here may
15    have some questions for you.
16  A    Okay.
17         MR. POPE:  Thank you, Mr. Davis.
18              CROSS-EXAMINATION
19  BY MR. POPE:
20  Q    Mr. Harris, I'm going to kind of take you back a
21    little bit to August 26th, 2000.  Did you ever
22    speak with Mr. Griggs on August 26th?
23  A    No, sir.
24  Q    Did you ever see him get inside that Lincoln
25    Navigator?

1  A    No, never saw him get in.

2  Q    Did you see him leave and then come back?

3  A    I saw him leave the premises, yes, walk out of

4       the showroom.

5  Q    How did he leave?

6  A    I don't know if he was walking or if he had

7       transportation or what, but I saw him when he

8       left, and then he came back a few hours later.

9  Q    How long was he there the first time?

10 A    Probably not long.  Probably not long at all.

11 Q    Not long?

12 A    Probably a few minutes.

13 Q    Five minutes, 10 minutes?

14 A    I don't know exactly how long he was there.

15      Probably long enough to find out that he had a

16      customer and then that he came back, wished to

17      come back or whatever.

18 Q    And the second time, did you see him come back

19      the second time?

20 A    Yes.

21 Q    But you didn't see him get inside the Lincoln

22      Navigator?

23 A    No.

24 Q    Did you know that he was looking at the Lincoln

25      Navigator?

```
 1   A    Yes, he told me.

 2   Q    He told you when?

 3   A    No, Demetrius told me.

 4   Q    Demetrius tell you that day?

 5   A    Yes.

 6   Q    Now, when you're at Peachtree Mall, you testified

 7        that you identified him, hey, that's the guy that

 8        shot you?  Is that what you testified to?

 9   A    That's exactly right.

10   Q    But you didn't see the Defendant get in that

11        Lincoln Navigator, did you?

12   A    No, I didn't.

13             MR. POPE:  No further questions.

14             MR. DAVIS:  Thank you, Mr. Harris.

15             THE WITNESS:  Thank you.

16             MR. DAVIS:  Appreciate you coming.

17             THE COURT:  May he be excused?

18             MR. DAVIS:  We would ask that he be excused,

19        if it please the Court.

20             THE COURT:  We're going to recess for

21        lunch.  It's five minutes after 12.  All right,

22        ladies and gentlemen.  We'll recess till 20

23        minutes after one.  Please be back by 1:20, so we

24        can resume the testimony with the next witness.

25             Keep in mind the Court's instruction do not
```

1    discuss the case, even among yourselves, or allow

2    anyone to discuss the case in your hearing, and

3    you may not discuss the case until it's submitted

4    to you by the Court with the Court's

5    instruction.  Thank you, and please be prompt so

6    we can start back on time.  We have a number of

7    witnesses we need to get to today.

8                    (Lunch recess.)

9                    (Jury present.)

10         THE COURT:  All right, ladies and

11    gentlemen.  Welcome back, and thank you for being

12    prompt.  We will begin with the testimony of the

13    next witness.

14         Who would the State call as its next

15    witness?

16         MR. DAVIS:  Call Randy Lavoie.

17                    RANDY LAVOIE

18     was sworn and testified as follows:

19                DIRECT EXAMINATION

20 BY MR. DAVIS:

21 Q    Tell us your name, please?

22 A    Randy Lavoie.

23 Q    Randy, where do you live?

24 A    I live at 8279 Midland Trail.

25 Q    Is that in Columbus?

1   A   Yes, sir.

2   Q   And where do you work?

3   A   I work at Rivertown Ford.

4   Q   How long have you worked at Rivertown Ford?

5   A   Since August 1st.

6   Q   And what do you do there?

7   A   I'm the finance director.

8   Q   Before that, where were you employed?

9   A   At Gateway Lincoln-Mercury-Isuzu.

10  Q   And what did you do there?

11  A   I was the finance manager, and before that I was

12      a salesperson.

13  Q   How long did you work at Gateway?

14  A   For five years.

15  Q   While you were there, did you know Demetrius

16      Jackson?

17  A   Yes, sir.

18  Q   How about Bryant Harris?

19  A   Yes, sir.

20  Q   Do you actually work with both of them now at

21      Rivertown?

22  A   Yes, sir.

23  Q   On August the 26th of the year 2000, were you

24      working at Gateway?

25  A   Yes, sir.

1    Q    During the course of that day, did you have

2         somebody who came to you and identified

3         themselves as Al Thomas that wanted to buy or

4         wanted to talk about buying a Lincoln Navigator?

5    A    Yes, sir.

6    Q    You see that person in the courtroom today?

7    A    Yes, sir.

8    Q    Would you stand up and show the ladies and

9         gentlemen of the jury who he is and where he is?

10   A    That man sitting right there.

11   Q    Where did you see him?

12   A    I saw him in my office.

13   Q    Who brought him to your office?

14   A    Demetrius Jackson.

15   Q    Did he sit down in your office?

16   A    Yes, sir.

17   Q    Did you talk to him?

18   A    Yes, sir.

19   Q    Ask him questions and he responded?

20   A    Yes, sir.

21   Q    What was the conversation about, if you remember?

22   A    About the financing of a Navigator.  Basically,

23        he was supposed to go get some financing at TIC

24        Federal Credit Union.

25   Q    That's what he told you?

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | And did you offer to do financing in another way? |
| 3 | A | Yes, sir. |
| 4 | Q | Is that something you typically do in your job? |
| 5 | A | Yes, sir. |
| 6 | Q | Well, do you have to run a credit check on |
| 7 | | somebody to do financing like that? |
| 8 | A | Yes, sir. |
| 9 | Q | And did you do that? |
| 10 | A | I tried.  He wouldn't let me. |
| 11 | Q | How long would you say you were sitting across |
| 12 | | the table talking to this fella? |
| 13 | A | At least three to five minutes. |
| 14 | Q | When he left, did you see him leave? |
| 15 | A | I saw him leave, yeah. |
| 16 | Q | Who did he leave with? |
| 17 | A | I believe he left by himself. |
| 18 | Q | Did you see him once that day or twice? |
| 19 | A | I saw him once that day. |
| 20 | Q | Okay.  How did you become aware that Mr. Jackson |
| 21 | | had been shot? |
| 22 | A | I was at the dealership still.  I was outside |
| 23 | | smoking a cigarette, and someone came outside and |
| 24 | | said that Demetrius had been shot, and we asked |
| 25 | | them, you know, well, where is he, what's going |

1    on and how's he doing and they said he was up at

2    the hospital, so we just basically all went over

3    there.

4    Q    Did you see Mr. Jackson at the hospital?

5    A    Yes, sir.

6    Q    The Defendant as he sits here today, does he look

7         any different than he did when you saw him on the

8         26th of August?

9    A    Yes, sir.

10   Q    How is he different?

11   A    His hair is shorter and he's better dressed.

12   Q    Let me show you some photographs that are marked

13        as State's Exhibits 11 and 12.  Ask you to look

14        at them.  Tell me, do you recognize those

15        photographs?

16   A    Yes, sir.

17   Q    Is that the Defendant as he appeared on August

18        the 26th of 2000 at Gateway Lincoln-Mercury?

19   A    Yeah.  I mean, he had long hair just like that.

20        He had little sideburns.  I think his beard has

21        grown out a little bit here, but he had sideburns

22        at that time, but that's the same face and hair.

23           MR. DAVIS:  If it please the Court, we move

24        to introduce State's Exhibits 11 and 12.

25           THE COURT:  Be admitted and received.

88

```
 1              (State's Exhibits 11 and 12 were
 2              admitted in evidence.)
 3         MR. DAVIS:  Ask to publish them to the
 4    jury.
 5         THE COURT:  You may do so.
 6         MR. DAVIS:  The witness is with you.
 7         MR. POPE:  Thank you, Mr. Davis.
 8              CROSS-EXAMINATION
 9    BY MR. POPE:
10    Q    Mr. Lavoie, what was the Defendant wearing on
11         that day?
12    A    He had baggy clothes.  He had a pair of pants and
13         a shirt that was not tucked in.  It was just
14         hanging outside of his pants.  Baggy clothing.
15    Q    What color was his shirt?
16    A    I don't recall the color.
17    Q    What color were the pants?
18    A    Dark.  It was a darker color, I believe, but I
19         don't really -- I mean, I wasn't really looking
20         at his clothes as much as looking at his face and
21         his eyes because every time I talk to a customer,
22         I'm basically making eye contact.
23    Q    You can identify the Defendant's face, but not
24         anything he was wearing?
25    A    No, sir.
```

1   Q   Did you ever see the Defendant get in the Lincoln
2       Navigator?

3   A   No, sir.

4   Q   Was he talking to you about financing the Lincoln
5       Navigator?

6   A   What happened was he was turned over to me like
7       he's supposed to be.  All the customers have to
8       talk to me before they go get outside financing,
9       so I was trying to talk him into -- you know,
10      since he said he was going to put $20,000 down,
11      I'd like to finance him in-house.  And at that
12      time he said that he had his financing all set up
13      at TIC and all he had to do was go over there and
14      show them the paperwork, a copy of the buyer's
15      order, and just come back after.

16   Q   On an average day, how many people do you see in
17      the finance department?

18   A   When I was working at Gateway, I'd probably see
19      between four and five, average, at Gateway.

20   Q   What's your busiest day?

21   A   Usually Mondays.

22   Q   Usually Mondays?

23   A   Yes, sir.

24   Q   How many people did you see that day, on
25      Saturday?

1    A    Not many.  We weren't very busy.

2    Q    You weren't very busy?

3    A    I'd say probably between four and six at the

4         most.

5    Q    Did you make a statement to the police regarding

6         this case?

7    A    At the hospital?

8    Q    Did you ever make a statement to the police

9         regarding this case?

10   A    Yes, sir.  I believe at the hospital.

11   Q    At the hospital?

12   A    Uh-huh (positive response).

13   Q    Did you describe to them what the person you

14        claim to be the individual that took the Lincoln

15        Navigator that came into your office, did you

16        describe to them what he looked like?

17   A    Yes, sir.

18   Q    Did you describe to them what he was wearing?

19   A    Yes, sir.

20   Q    And what did you tell the police that he was

21        wearing that day?

22   A    Baggy clothing.  I don't remember about any

23        colors, okay.  But I remember he had baggy

24        clothes.  I told them, I believe, that he had

25        short hair, actually a little longer.  About this

```
1          high, I think, I told them off the top of his
2          head.  Told them about the sideburns.
3     Q    Did you ever tell them that he was wearing an
4          Hawaiian type shirt?
5     A    Very possible.
6     Q    Do you remember telling them that he was wearing
7          dark pants?
8     A    I don't recall, sir.
9     Q    When the Defendant was in your office, did he
10         touch anything?
11    A    I cannot recall.
12    Q    Well, did he sit down when he was talking to you?
13    A    Yes, sir.  Kind of -- the way my office was set
14         up, there were two chairs, okay, on the front of
15         my desk, and basically the whole time he just
16         kind of sat back relaxed.  I don't remember him
17         touching anything like on my desk or anything.
18         Just kind of sat back relaxed, kind of half
19         paying attention.  Didn't really look like he was
20         too interested in what I was talking to him
21         about.
22    Q    Did the police come out to your office?
23    A    When I was there that day?
24    Q    The following day.
25    A    I believe so.
```

92

1    Q    Did they dust for prints?

2    A    Yes, sir.

3              MR. POPE:  I have no further questions.

4              MR. DAVIS:  Thank you, Mr. Lavoie.  We

5    appreciate you coming.

6              THE COURT:  May he be excused?

7              MR. DAVIS:  We ask that he be excused, if it

8    please the Court.

9              THE COURT:  Who's the next witness?

10             MR. DAVIS:  Mr. Lavoie, you can go outside.

11   You can remain in here, if you'd like.

12             THE WITNESS:  Okay.

13             MR. DAVIS:  Officer Greg Ballard.

14                  (Brief pause.)

15             MR. DAVIS:  Judge, I'm sorry.  Apparently,

16   he's in my office.  He'll be right here.

17             THE COURT:  Okay.  If you have any more down

18   there, bring them on up.

19             MR. DAVIS:  Yes, sir.  Everybody else is up,

20   Judge.

21                    GREG BALLARD

22        was sworn and testified as follows:

23                 DIRECT EXAMINATION

24   BY MR. DAVIS:

25   Q    Tell us your name, please?

1   A   Gregory Ballard.

2   Q   And how are you employed?

3   A   Columbus Police Department.

4   Q   How long have you worked for the police

5       department?

6   A   Seven-and-a-half years.

7   Q   On August the -- I'm sorry, on October the 19th

8       of 2000, were you working at the police

9       department?

10  A   Yes.

11  Q   Did you have an occasion in the evening hours of

12      that day, I believe the early evening hours, to

13      respond to a call at Peachtree Mall?

14  A   Yes, I did.

15  Q   Do you know what the nature of that call was?

16  A   I responded to a call where Mr. Demetrius Jackson

17      had spotted a subject that he believed had shot

18      him and robbed him on August 26th, 2000.  Excuse

19      me, I just run up the stairs.

20  Q   I understand.

21  A   I'm just trying to catch my breath.

22  Q   I have to do that every day.  It gets higher and

23      higher?

24  A   So I responded there and met with Mr. Jackson and

25      mall security, who stated that they had stopped

94

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | the subject, I believe, outside the mall and had            |
| 2  |   | detained him inside the loss prevention office.             |
| 3  | Q | Was he taken into the custody of the Columbus               |
| 4  |   | Police Department?                                           |
| 5  | A | Yes, he was.                                                 |
| 6  | Q | And it was determined that he was, in fact, Avery           |
| 7  |   | Griggs?                                                       |
| 8  | A | Yes.                                                         |
| 9  | Q | Do you see him in the courtroom today?                       |
| 10 | A | Yes, sir.                                                    |
| 11 | Q | Would you point him out to the ladies and                   |
| 12 |   | gentlemen of the jury?                                       |
| 13 | A | He's the black male defendant sitting at that               |
| 14 |   | table there.                                                 |
| 15 | Q | Now, did you transport him or was he transported            |
| 16 |   | to the Columbus PD?                                          |
| 17 | A | I transported him.                                           |
| 18 | Q | In the course of somebody being arrested and                |
| 19 |   | taken to the PD, do you typically take their                |
| 20 |   | personal belongings from them; wallets, things              |
| 21 |   | like that?                                                   |
| 22 | A | Yes, sir.                                                    |
| 23 | Q | Did you do that in this case?                                |
| 24 | A | Yes, sir.                                                    |
| 25 | Q | Do you know this officer, Mike Vargo?                        |

1    A    Yes, sir.

2    Q    Did Mike Vargo, who is a Phenix City police

3         officer, did he come to the Columbus PD that day?

4    A    Yes, sir.

5    Q    And did you give him anything that you had taken

6         from the Defendant?

7    A    Yes, sir.  I initially gave him all the personal

8         property that belonged to the defendant.

9    Q    And did that include a wallet?

10   A    Yes, sir.

11              MR. DAVIS:  The witness is with you.

12                    CROSS-EXAMINATION

13   BY MR. POPE:

14   Q    Did you look through the wallet?

15   A    No, sir, I didn't.

16   Q    So you just got the wallet and then passed it

17        onto Mike Vargo?

18   A    Yes, sir.

19              MR. POPE:  Thank you.

20              MR. DAVIS:  Thank you, Officer Ballard.  I

21        appreciate you coming.

22              THE WITNESS:  Thank you.

23              MR. DAVIS:  Can he be excused, Judge?  He's

24        got to work tonight.

25

<u>EXAMINATION</u>

<u>BY THE COURT</u>:

Q    Let me ask you this, Mr. Ballard.  Did you add or
     take anything from that wallet or from that
     personal property?

A    No, sir.

Q    And was there other personal property other than
     the wallet that you delivered?

A    Yes, sir.  I'm not positive of all it was.  I
     believe there was a cell phone and a few other
     items.

Q    Did you keep a property or inventory list of
     those items?

A    No, sir.  I turned them over.

Q    How long did you have those items in your
     possession before you turned them over to Officer
     Vargo?

A    I would say less than an hour.

Q    And did those items leave your possession at any
     time?

A    Yes, sir.  They was turned over to Detective
     Vargo.

Q    Well, in the time that you had them, once you
     seized them and then you turned them over, did
     they leave your possession at any time?

1    A    Yes, sir.

2    Q    What were the circumstances in which you took

3         them from Mr. Griggs?

4    A    Conducted a pat-down search of him, detained him,

5         and held them in my possession until we

6         determined --

7    Q    Did you actually remove them off of his person,

8         not from a vehicle or anything else?

9    A    Yes, sir, off his person.

10   Q    The billfold, where was that located on Mr.

11        Griggs?

12   A    I honestly cannot recall, Your Honor.

13   Q    And after you took those items, what did you do

14        with them?

15   A    I placed them in the front seat of my patrol car.

16   Q    Was anybody else in the patrol car?

17   A    No, sir.

18   Q    And after you put them in the front seat of the

19        patrol car, what did you do with the items?

20   A    I transported Mr. Griggs to the police

21        department, took him and his personal property up

22        to the detective office, waited for Detective

23        Vargo and, I believe, it was Lieutenant Brian

24        McGarr responded to the department, at which time

25        I turned them over to Detective Vargo.

98

1    Q    Did anyone else other than yourself have access

2         to those items until you handed them over to

3         someone?

4    A    No, sir.

5              THE COURT:  Any further questions of this

6         witness?

7              MR. DAVIS:  Not from the State.

8              MR. POPE:  No, Your Honor.

9              THE COURT:  You may step down.  Who's the

10        State's next witness?

11             MR. DAVIS:  We call Investigator Vargo.

12        Thank you, Greg.

13             THE WITNESS:  You're welcome.

14                      MICHAEL VARGO

15            was sworn and testified as follows:

16                   DIRECT EXAMINATION

17   BY MR. DAVIS:

18   Q    Tell us your name, please?

19   A    Michael Vargo.

20   Q    How are you employed?

21   A    I'm an investigator with the Phenix City Police

22        Department.

23   Q    How long have you worked for the police

24        department?

25   A    13, going on 14 years.

| | | |
|---|---|---|
| 1 | Q | You were working for the police department on |
| 2 | | August the 26th of the year 2000? |
| 3 | A | Yes, sir. |
| 4 | Q | Do you recall in the evening hours, the early |
| 5 | | evening hours of that day, going to a location in |
| 6 | | Phenix City and Russell County, Alabama in |
| 7 | | response to a call? |
| 8 | A | Yes, sir. |
| 9 | Q | Where was that? |
| 10 | A | It was 431 South, about a couple hundred feet |
| 11 | | from 165. |
| 12 | Q | Did you go there alone or with somebody else? |
| 13 | A | I arrived there maybe 10 minutes after five that |
| 14 | | afternoon. |
| 15 | Q | Were there other police officers that were |
| 16 | | already there? |
| 17 | A | Yes, there were.  Yes, there were. |
| 18 | Q | That place that you went to, when you got there, |
| 19 | | did you see Demetrius Jackson? |
| 20 | A | No.  He had already been transported by ambulance |
| 21 | | by the time I got there. |
| 22 | Q | What did you do when you got there, Investigator |
| 23 | | Vargo? |
| 24 | A | When I got there, I was instructed, myself and |
| 25 | | Investigator Lawrence and Investigator Andy |

100

1    Williams who arrived on the scene, we were given

2    different orders through Lieutenant McGarr who

3    was also on the scene of what he wanted us to

4    do.  At that particular time I spoke with Mr.

5    McKinnon who gave a statement here today.

6  Q  Is that the Mr. McKinnon that testified here

7    earlier today?

8  A  That's correct.  I also used a measuring device,

9    a measuring wheel, to measure the distances

10   between the blood spots that we found on the

11   outer lane of 431 South where the victim had fell

12   out of the vehicle.

13       After the scene was complete, I was then

14   instructed to go to the car lot, Gateway

15   Lincoln-Mercury, to find out if the suspect had

16   driven there himself or was dropped off to see if

17   there might have been a car there at the car

18   dealership that might have been left there.

19  Q  Let me show you what's marked as State's Exhibit

20   13.  Do you recognize that exhibit?

21  A  Yes, sir.

22  Q  And what is that exhibit?

23  A  That is the crime scene, sir, on 431.

24  Q  Where is that located?

25  A  That is the outer lane of 431 South.

1   Q   Is it in Phenix City and Russell County, Alabama?

2   A   Yes, sir, it is.

3   Q   Did you find blood or what appeared to be blood

4       on the roadway?

5   A   Yes, sir.

6   Q   In one or more places?

7   A   Yes, sir.

8   Q   Do you know what the distance between the first

9       blood mark that you found and the last blood mark

10      would be?

11   A   I can't recall.  I had the distances placed in

12      the report.  I don't recall the distances.

13   Q   This photograph accurately depicts that scene as

14      you were there that day; is that right?

15   A   Yes.

16   Q   In fact, are you in this photograph?

17   A   Yes, sir.  I believe that's myself speaking with

18      Mr. McKinnon there by the pickup truck.

19   Q   Okay.

20         MR. DAVIS:  We ask to publish it to the

21      jury, if it please the Court, move that it be

22      introduced.

23         THE COURT:  You may do so.  Be admitted and

24      received.

25           (State's Exhibit 13 was admitted in

102

1               evidence.)

2   Q    Now, you say you went to Gateway?

3   A    Yes, sir.

4   Q    Well, Mr. Jackson wasn't there when you got

5        there, so you got your information about whatever

6        had happened from someone else; is that right?

7   A    Yes, sir.  Lieutenant McGarr advised me that he

8        had instructed Investigator Lawrence -- he had

9        got some information as far as personal

10       information that the suspect had left at Gateway

11       Lincoln-Mercury and told me that the individual

12       had left the name of Al Thomas, given an address

13       of 947 34th Avenue in Columbus, Georgia, with a

14       phone number.  And he also instructed me to go

15       and see if maybe a car was left there on the

16       scene by the suspect.

17  Q    Let me show you what has previously been marked

18       as State's Exhibit Number 1.  Do you recognize

19       that exhibit?

20  A    Yes, sir.

21  Q    What is it?

22  A    This is a -- it looks like a vehicle information

23       for a customer for a purchase form on a vehicle

24       from Gateway Lincoln-Mercury.

25  Q    Did you take that into your custody or did some

1    other officer?

2  A   I believe it was Investigator Lawrence, if I'm

3    not mistaken.

4  Q   Now, you went to Gateway.  Do you know what time

5    it was when you got there?

6  A   I got there on the scene about, like I said,

7    about 10 minutes after five that afternoon.  It

8    could have been anywhere within two to

9    two-and-a-half hours, I would say.

10  Q   When you got there, did you see any of the people

11    who testified here today?

12  A   I spoke with a Mr. Mike Affleck.

13  Q   He hasn't testified today?

14  A   No, sir.

15  Q   But he was there; is that right?

16  A   Yes, sir.  And I asked him did he recognize any

17    vehicles outside of the lot that he didn't

18    recognize, and he stated there was one vehicle,

19    and he pointed to a 1984 Oldsmobile Calais, light

20    blue in color, with a Georgia tag number on it.

21    I looked through the window at the vehicle and

22    there was a name tag of Affie for Wal-Mart.

23        I checked with the Columbus Police

24    Department DMV, which is a Department of Motor

25    Vehicles Department, and had them run that tag

1    number.  It came back to an Affie Mae Tyson, I

2    believe it was, at Booker T. Washington

3    Apartments, 501-E.

     I left from there and went and met with Ms.

5    Tyson, who stated that she had left the car there

6    that day.  She was having vehicle problems, and

7    she was planning on going back to pick it up.

8    Q    Okay.  So that car wasn't connected with this

9    case?

10   A    No, sir.

11   Q    Well, what did you do next, Mike?  What did you

12   do next in this case?

13   A    Well, the next day I went back to Gateway

14   Lincoln-Mercury and met back with Mr. Affleck.  I

15   went over with him for him to show me where the

16   suspect, where he was at inside the business

17   establishment, what offices he was in.

18   Q    Was he in more than one office?

19   A    If I can recall, --

20   Q    According to them?

21   A    If I can recall, I believe I went to two

22   different offices, one being Mr. Jackson's.

23   Q    What did you do in those offices?

24   A    In those offices, I went in and fingerprinted

25   the -- attempted to fingerprint the table.  I'm