1      not sure if I tried to fingerprint the chair or

2      not.  And then I went to a Mr. Jackson's office

3      and fingerprinted his table as well.

4  Q  Did you lift any prints?

5  A  I lifted, I believe, one fingerprint off the

6      table of Mr. Jackson along with a palm print.

7  Q  Now, you're trained to do that, I suppose?

8  A  Yes, sir.

9  Q  You get training to do that as a police officer?

10  A  Yes, sir.

11  Q  Well, after you took those prints, what did you

12      do?

13  A  Like I said, they were placed with us while we

14      were continuing the investigation.

15  Q  What did you do next in the investigation?

16  A  What happened was the day after that, on August

17      the 28th, when I came to report for duty that

18      morning, Lieutenant McGarr got with me and stated

19      that a female employee, a cashier named Sandra

20      Cantrell from Lanett, Alabama had called, and

21      there may have been a possible lead in the case

22      as to the vehicle.

23          I made preparations and I went to Lanett,

24      Alabama, to the Holiday Exxon Station located in

25      Lanett, Alabama, and spoke with Ms. Cantrell.

1     And she stated that earlier on that date, when

2     she was getting her children ready for school, --

3  Q  When you say that day, was that the 28th?

4  A  The 28th.  She was getting her children ready for

5     school, and she saw on the news about the case in

6     Phenix City and regarding this case.  She said it

7     then jogged her memory the previous night on the

8     27th, August the 27th, sometime after nine that

9     morning, a black male had came into the store a

10    few times, and she had looked outside later on

11    and saw what she believed to be a white Lincoln

12    Navigator facing away from the service station.

13      She stated that the black male had came in

14    one -- on the first time he came in, she stated

15    he acted as though he didn't know where he was,

16    asking had she been busy that day.  He then left

17    out of the store.  He came back shortly

18    thereafter and asked for a phone card, if they

19    had any phone cards, to which she replied yes,

20    and he asked for a $5.00 phone card and gave her

21    a $5.00 bill, and then he left out of the store.

22    Best of my memory, she said he kept walking back

23    and forth across the parking lot to a pay phone.

24      While she was in the store getting ready to

25    close, she noticed the white Navigator.  She went

1    to the front and looked out and noticed the white

2    Navigator, so she went back to the store

3    finishing up her work duties there, and as she

4    was getting ready to cut the lights off to

5    leave -- well, before that, she noticed again

6    that the Navigator had been moved to a parking

7    lot of the Days Inn which is located next to the

8    service station.  And then as she was closing up

9    and getting ready to leave, she noticed that the

10   vehicle was gone.

11   Q    Okay.  Did you take anything into your custody or

12        receive any evidence while you were up there or

13        what you thought might be evidence?

14   A    Yes, sir.  What had happened was I took the

15        videotape from the store of this particular black

16        male who had walked in, and also I asked her

17        could she give me information as to what kind of

18        a phone card it was, and I believe it was from

19        Telefine, Incorporated.  That particular phone

20        card, I asked her is there any which she could

21        give me the information as to that particular

22        type of card, and she called a representative and

23        got a control number for that card.  I also

24        got -- she had it logged down.  When they make a

25        sale of these phone cards, they have to log them

1   down, and I got the information as far as when

2   that was sold and the time, and I took that card

3   with me as well.

4   Q   Okay.  Now, this videotape that you took from

5       her, what did you do with it?

6   A   I immediately took it, and I came back to Phenix

7       City, Alabama and went and had some still

8       photographs made off of the videotape.

9   Q   Did you show those photographs to anybody?

10  A   Yes, sir, I did.  I showed those still

11      photographs to the victim, Mr. Jackson.

12  Q   And what did Mr. Jackson say about those

13      photographs?

14  A   Mr. Jackson stated that was not the black male.

15  Q   That's not the guy, so that was just a false

16      lead?

17  A   That's correct.

18  Q   Now, the Navigator was taken on the 26th; is that

19      right?

20  A   That's correct.

21  Q   Did you come to see that Navigator sometime

22      later?

23  A   Yes, sir.  It was on the 3rd of September.

24  Q   Where did you see it?

25  A   A patrol officer, Jonathan Sims, was patrolling

1     through the area of Hawthorn Apartments in Phenix

2     City, Alabama and saw a white Navigator sitting

3     on the back of a Dixie Wrecker Company truck.  I

4     met him there, and it was indeed the same

5     Navigator that had been reported stolen.

6  Q   That Navigator was recovered on September the 1st

7     by the Birmingham PD?

8  A   Yes, sir, it was.  It was recovered in Birmingham

9     on the 1st of September.  I believe it was

10    sometime around 4:30 that morning.

11  Q   It had been abandoned on 10th Avenue?

12  A   Yes, sir.

13  Q   It was later identified by the people at Gateway

14    as being that same car that was taken from

15    Gateway; is that correct?

16  A   That's correct.  And I also checked the VIN.  It

17    was the same vehicle.

18  Q   Did you do anything with regard to that

19    Navigator?

20  A   Yes, sir.  It was brought back to the station,

21    whereupon at that time myself and Investigator

22    Lawrence processed the vehicle for fingerprints

23    while Lieutenant McGarr photographed the areas

24    where we lifted prints.

25  Q   Did you print the outside of the car?

1    A    Yes, sir.

2    Q    Inside of the car?

3    A    Yes, sir.

4    Q    Were there any contents in the car, personal

5         effects of any kind?

6    A    Best I can recall, there was a key in the console

7         area.  There were approximately five CDs in the

8         console area.  There was a T-shirt and a pair of

9         briefs -- well, not -- I can't recall if they

10        were briefs or not, but there were a pair of

11        underwear in the rear backseat by the hatchback

12        along with a gray in color New York Yankees ball

13        cap with a black bill on it.

14   Q    Did you try to fingerprint those things?

15   A    The clothes, no.

16   Q    Why didn't you fingerprint the clothes?

17   A    You can't fingerprint clothes.

18   Q    How about the CDs, did you try to fingerprint

19        those?

20   A    Tried to fingerprint the CDs, but was

21        unsuccessful in lifting any prints.

22   Q    The dash, the seats, the outside, did you

23        fingerprint all that?

24   A    Yes, sir.

25   Q    Did you get some prints?

1    A    Yes, sir.

2    Q    What did you do with those?

3    A    Those prints, I took all the prints that were

4         lifted from the interior and exterior of that

5         vehicle and I took them to the Columbus Police

6         Department, and I met with a technician, George

7         Godfrey, with the ID division, and I released

8         those prints to him, where he then in turn

9         entered those fingerprints into the Georgia AFIS

10        system, which what it does is it checks to see if

11        there's a match anywhere in the State of Georgia,

12        anybody who's ever been arrested in the State of

13        Georgia before, and when he would enter those

14        prints, it would come back a hit and come back a

15        match.

16   Q    And did you get any such case?

17   A    No, sir.

18   Q    Did you take Mr. Jackson's fingerprints and try

19        to compare them, see if any of those prints were

20        his print?

21   A    No.

22   Q    How about all the people that work at Gateway; I

23        mean, the guy who washes the cars?

24   A    No.

25   Q    The people who drive them, the other salesmen?

1    A    No, sir.

2    Q    Take their prints and try to match them?

3    A    No, sir.

4    Q    Let me show you two photographs.  They'll be

5         marked as State's Exhibits 14 and 15.  Ask you to

6         look at them and just tell the ladies and

7         gentlemen of the jury if you recognize them?

8    A    State's Exhibit Number 14, this is the interior

9         of the Navigator depicting the driver's side and

10        front passenger seat areas.  State's Exhibit 15

11        is the backseat.  This is the middle section

12        depicting the backseat area.

13   Q    Now, the things that were in the vehicle, these

14        clothes that you described, the pair of

15        underwear, I think a shirt?

16   A    And ball cap.

17   Q    CDs, did you take those things into your custody

18        and control?

19   A    Yes, sir.

20   Q    They'll be in that box right there; is that

21        right?

22   A    Yes, sir.

23   Q    Packaged up with maybe the victim's clothing and

24        things like that?

25   A    Yeah.  The items that were taken out --

1   Q    In any event, you packaged them up as evidence;
2        is that correct?
3   A    That's correct.
4   Q    Now, on the 3rd, you saw the Navigator and you
5        tried to lift fingerprints, lifted some.  What
6        did you do next in this investigation?
7   A    Basically, I was called at home off-duty on
8        October the 19th.
9   Q    Well, let me stop you just a moment before we go
10       to October the 19th.  When you spoke with the
11       people at Gateway, when you spoke with Mr.
12       Jackson, did you find that the person who
13       identified himself as Al Thomas, the person who
14       took that vehicle and shot Mr. Jackson, did you
15       find that he had given an address?
16  A    Yes, sir.  Let me go back to that.
17  Q    Tell us about that.
18  A    I did indeed go to the address that he listed on
19       that form, 947 34th Avenue, and I spoke with an
20       elderly black gentleman by the name of Jordan
21       Olman James, and I questioned him about does he
22       know anybody named Al Thomas.  I gave him a
23       description that Mr. Jackson had gave, and he
24       stated that, no, it's just him and his wife and
25       his 41-year-old daughter live there at that house

1        and he had no knowledge of it.

2    Q   And was that 947?

3    A   That was 947, yes, sir.

4    Q   And they didn't know any Al Thomas?

5    A   No, sir.

6    Q   No Al Thomas lived there?

7    A   No, sir.

8    Q   Did you do anything else with regard to that

9        address that you recall?

10   A   No, sir.  Well, what I did was I also took --

11       this was before I had showed the surveillance

12       photos to Mr. Jackson.  I had taken those photos

13       going door-to-door with those photographs in

14       hopes that somebody may recognize the black male

15       that was in those photographs, and that was all I

16       did that particular day on that incident.

17   Q   Do you know what an Identi-Kit is?

18   A   Yes, sir.

19   Q   What is an Identi-Kit?

20   A   What that is, it's a -- we're trained to use,

21       it's a Smith & Wesson Identi-Kit composite

22       system, where any victim of a crime will come in

23       and what we'll do is have them sit down and they

24       give us a description, a basic description of the

25       suspect, and we start entering into that

1     computer, and we try to get it as close as the

2     victim could remember on how this individual

3     looked.

4  Q    Well, does it have like different noses?

5  A    Yes, sir.

6  Q    And chins and foreheads?

7  A    Yes, sir.  You can place different noses, eyes,

8     ears, facial tones, chin structures, et cetera.

9  Q    Did you do that in this case?

10  A    Yes, sir, I did.

11  Q    Do you know when you did it?

12  A    I believe it was September the 20th.

13  Q    Do you have that in this file?  Is this your case

14     file?

15  A    Yes, sir.

16  Q    Do you have it in the file?  Would you take a

17     moment and see if you can find it for me.

18          MR. DAVIS:  Judge, if it please the Court,

19     we move to introduce State's Exhibits 14 and 15.

20          THE COURT:  Be admitted and received.

21             (State's Exhibits 14 and 15 were

22               admitted in evidence.)

23  A    I found it.

24  Q    And do you recognize that?

25  A    Yes, sir.

1    Q    Can you take it out of your file?

2              (Witness complies.)

3    Q    When was it that you did this?

4    A    September 20th.

5    Q    And where did you do it?

6    A    In my office at the Phenix City Police

7         Department.

8    Q    And who was there?

9    A    Myself and Mr. Jackson.

10   Q    I'll show you now what I had marked as State's

11        Exhibit 16.  Is that the Identi-Kit that was done

12        at that time?

13   A    Yes, sir.

14   Q    That's the same kit.  You hadn't changed or

15        altered it in any way, added or subtracted

16        anything to it or from it?

17   A    It's the same Identi-Kit.

18             MR. DAVIS:  Move to introduce State's

19        Exhibit 16, if it please the Court.

20             THE COURT:  Be admitted and received.

21                (State's Exhibit 16 was admitted in

22                 evidence.)

23             MR. DAVIS  Ask to publish it.

24             THE COURT:  You may do so.

25   Q    Well, that's September the 16th; is that right?

1    A    That was the 20th of September.

2    Q    Okay.  What happened next in this case?

3    A    That's when I was contacted on October the 19th

4         by Lieutenant McGarr.  I was off-duty.  He just

5         briefly advised me that Mr. Jackson and Mr.

6         Harris had seen the suspect in Peachtree Mall

7         that day, just give me a brief run-down, and

8         wanted to know if I could go to the Columbus

9         Police Department where he was transported to and

10        speak with him.

11   Q    Did you do that?

12   A    Yes, sir, I did.

13   Q    What happened when you got to the police

14        department?

15   A    When I got to the police department, I met with

16        Detective Culverson.  Lieutenant McGarr from

17        Phenix City Police arrived.  And I also met with

18        Officer Greg Ballard, and they showed me the

19        contents of some items he had -- that Officer

20        Ballard had taken off of Mr. Griggs.

21   Q    Is that the wallet and the phone and other things

22        that Officer Ballard testified to earlier?

23   A    Yes, sir, and a black doo rag.

24   Q    I'm sorry, a black what?

25   A    It's a doo rag.

1    Q    A doo rag?

2    A    They put it over their head and tie it in the

3         back.

4    Q    Did you take that into your custody and control?

5    A    What I did was myself and Lieutenant McGarr was

6         looking at the items, and we looked into the

7         wallet and that's when I found the business card

8         of Mr. Jackson in that wallet. Also, I found a

9         TIC Credit Union credit card in the wallet as

10        well as a yellow sheet of paper that contained an

11        address of 946 34th Avenue in Columbus, Georgia.

12   Q    All those things were found in the wallet?

13   A    Yes, sir.

14   Q    Let me show you what's been previously marked as

15        State's Exhibit 9. Do you recognize that

16        exhibit?

17   A    Yes, sir.

18   Q    Is that the business card of Demetrius Jackson

19        that you found in the wallet of the Defendant on

20        the 19th of October?

21   A    Yes, sir.

22   Q    Is it in the same condition as it was at the time

23        you found it?

24   A    Yes, sir.

25   Q    In fact, has it been sealed in this envelope

1       since you found it with your initials on it?

2  A    Yes, sir.

3  Q    And the date?

4  A    Yes, sir.

5       MR. DAVIS:  If it please the Court, we move

6      to introduce State's Exhibit 9.

7       THE COURT:  Be admitted and received.

8         (State's Exhibit 9 was admitted in

9         evidence.)

10      MR. DAVIS:  Ask to publish it to the jury.

11      THE COURT:  You may do so.

12  Q    You said you also removed some additional items;

13      is that correct?

14  A    A driver's license, several driver's licenses.

15      Just miscellaneous papers.

16  Q    Let me show you what's marked as State's Exhibit

17      17.  Do you recognize that exhibit?

18  A    Yes, sir.

19  Q    And what is it?

20  A    It's a yellow sheet of paper with an address of

21      946 34th Avenue, zip code 31906.

22  Q    And where did you see that previously?

23  A    It was in the wallet of Mr. Griggs.

24  Q    Does it appear to you to be in the same or

25      substantially the same condition today as it was

1    at the time you took it from the wallet of the

2    Defendant?

3  A    Yes, sir.

4        MR. DAVIS:  If it please the Court, we move

5    to introduce that exhibit; that's State's Exhibit

6    17.

7        THE COURT:  You may do so.

8            (State's Exhibit 17 was admitted in

9            evidence.)

10       MR. DAVIS:  Ask to publish it, if it please

11   the Court.

12  Q    Show you what's marked as State's Exhibit 18 and

13   ask you to look at it, and tell the ladies and

14   gentlemen of the jury if you recognize it?

15  A    Yes, sir.  This is a TIC Federal Credit Union

16   membership card with a member number and the

17   member name of Avery L. Griggs.

18  Q    And did you also recover that from the wallet of

19   the Defendant?

20  A    Yes, sir, I did.

21  Q    And does it appear to you to be in the same or

22   substantially the same condition today as it was

23   at the time you recovered it?

24  A    Yes, sir.  Yes, sir.

25       MR. DAVIS:  If it please the Court, we move

1       to introduce that exhibit, State's Exhibit 18.

2              THE COURT:  Be admitted and received.

3                   (State's Exhibit 18 was admitted in

4                   evidence.)

5              MR. DAVIS:  Ask to publish it to the jury.

6              THE COURT:  You may do so.

7   Q   Now, I take it that you saw the Defendant while

8       you were there; is that right?

9   A   Yes, sir.

10  Q   Let me show you two exhibits that have been

11      previously introduced, 11 and 12.  Ask you to

12      look at them.  Do you recognize those exhibits?

13  A   Yes, sir.  These are photographs taken of Mr.

14      Griggs.

15  Q   When and where were they taken?

16  A   These were taken -- I'm not sure if these were

17      taken at the Columbus Police Department or --

18      yeah.  I believe this was Columbus Police

19      Department.

20  Q   Were they taken on the 19th?

21  A   I believe they were, sir.

22  Q   Do they fairly and accurately depict the

23      Defendant, Avery Griggs, as he appeared on that

24      day?

25  A   Yes, sir.

1       MR. DAVIS:  Judge, I believe they are

2  previously admitted.  I would ask to publish

3  them.

4       THE COURT:  All right.  You may do so.

5       MR. DAVIS:  I may have sent those around

6  already.

7  Q  Now, after the Defendant, Avery Griggs, had been

8     arrested, did you take his fingerprints?

9  A  No, I didn't.

10  Q  Somebody did?

11  A  Yes.

12  Q  Some police officer did?

13  A  (Witness nods head affirmatively.)

14  Q  Were they compared to the prints that you

15     recovered at Gateway and the prints from the

16     automobile?

17  A  Yes, sir.

18  Q  Did they match?

19  A  No, sir.

20  Q  Did you ever match any of those prints with

21     anybody?

22  A  No, sir.

23  Q  Okay.

24       MR. DAVIS:  The witness is with you.

25

## CROSS-EXAMINATION

BY MR. POPE:

Q    Let's go back to the prints.  How many prints did
     you lift off the Navigator?

A    It was quite a few.  I can't recall.

Q    I believe in the report -- does it sound correct
     when I say in the report that you took 17 latent
     print cards off that Lincoln Navigator?  Does
     that sound right?

A    If that's in the report, yes.

Q    What is a latent print card?  Explain that.

A    What that is, it's just a regular card size of an
     index card -- it looks like an index card -- that
     has information such as case number, what kind of
     crime it is, and the fingerprint itself that you
     lift.

Q    Now, I'm going back to where you're processing
     the vehicle.  You pulled some items from that
     vehicle when they brought it back to Phenix City;
     correct?

A    That's correct.

Q    And what items were in the vehicle when you
     processed it?

A    When it was processed, there was a New York
     Yankees ball cap in the vehicle.  There were five

|    |   |                                                                   |
|----|---|-------------------------------------------------------------------|
| 1  |   | CDs.  I believe there was a key.  There was a                     |
| 2  |   | T-shirt.  And there were a pair of underwear in                   |
| 3  |   | the car, I mean, in the Navigator.                                |
| 4  | Q | You see what size underwear?                                      |
| 5  | A | I can't recall what size they were.                              |
| 6  | Q | I mean, would it sound correct if you made in                    |
| 7  |   | your report that they were extra large underwear?                |
| 8  | A | If that's what I put, that's what they were.                     |
| 9  | Q | And there was also a T-shirt in there as well?                   |
| 10 | A | Yes, sir.                                                         |
| 11 | Q | And in that report, it says the extra large                      |
| 12 |   | T-shirt.  Does that sound correct?                               |
| 13 | A | Yes, sir.                                                         |
| 14 | Q | There was also some food tray items or tray where               |
| 15 |   | you get food?                                                     |
| 16 | A | Yes, sir.                                                         |
| 17 | Q | With some fries, I believe?                                      |
| 18 | A | Yes, sir.                                                         |
| 19 | Q | Did you dust those for prints?                                   |
| 20 | A | I dust the Styrofoam container, yes, sir.                        |
| 21 | Q | Did you lift any prints from that?                               |
| 22 | A | Yes, I did.                                                       |
| 23 | Q | Where all did you lift prints?  Where all did you               |
| 24 |   | try to lift prints on that Lincoln Navigator?                   |
| 25 | A | All around the exterior.  All over the exterior,                |

1    also including the gas cap area.  Anywhere where

2    we could get a print to come up, that's what we

3    would lift.

4        MR. DAVIS:  I don't have any objection.

5  Q    I'm going to have you take a look at these

6    pictures.  And these pictures, do they fairly and

7    accurately represent the dusting of the Lincoln

8    Navigator for prints?

9  A    Yes, sir.

10       MR. POPE:  Your Honor, I'd like to mark

11    these as Defendant's Exhibits 1 through 4.

12       THE COURT:  All right.  You may do so.

13       MR. DAVIS:  No objection.

14       MR. POPE:  Actually, I made a mistake.  They

15    would be Exhibits 1 through 5.

16       THE COURT:  All right.

17  Q    After you took the 17 latent print cards, how do

18    you go about processing those to try to locate a

19    match?

20  A    Well, what we do is we took the prints, well, I

21    did, I took the prints over to the Columbus

22    Police Department and handed them to an ID tech

23    over at the Columbus Police Department, and what

24    they do is, I testified earlier, they enter it

25    into a AFIS system which goes through the whole

1      State of Georgia, and that's what I did.

2    Q   Did you ever think about running these over in

3      Alabama?

4    A   The fingerprints, if I'm not mistaken, I can't

5      recall if they were packaged up and sent to

6      Alabama.  I'm not sure if we have them here.  If

7      they're not here, it's a possibility they were

8      sent off.

9    Q   So you're not sure that you checked to see if

10      they had been run in Alabama?

11   A   That's correct.

12   Q   See if they'd find a match?

13   A   That's correct.

14   Q   You testified that you went to Gateway

15      Lincoln-Mercury; correct?

16   A   That's correct.

17   Q   And you ran some -- tried to lift prints there?

18   A   Yes, sir.

19   Q   Did you lift prints there?

20   A   Yes, sir.

21   Q   I think you testified that you lifted a

22      fingerprint and a palm print; is that correct?

23   A   Yes, sir.

24        MR. DAVIS:  No objection.

25   Q   Do these pictures accurately represent the areas

1      in which you dusted for fingerprints?

2  A   Yes, sir.

3  Q   And what did you do with these fingerprints?

4  A   Those fingerprints were taken as well to the ID

5      technician at the Columbus Police Department.

6  Q   And they were processed in Georgia?

7  A   Yes, sir.

8  Q   And did you find a match?

9  A   No, did not.

10  Q   Did you have them processed for Alabama?

11  A   That I can't recall.  I do not know.

12      MR. POPE:  Your Honor, I'd like to submit

13      these as Defendant's Exhibits 6 and 7.

14      MR. DAVIS:  No objection.

15      THE COURT:  Be admitted and received.

16         (Defendant's Exhibits 6 and 7 were

17         admitted in evidence.)

18  Q   Detective Vargo, is there a way in which you can

19      take a person's fingerprints or the fingerprints

20      that you lift off a vehicle and have that

21      processed nationally?

22  A   Nationally?  No.

23  Q   There's no such instrument, no --

24  A   We've never done it.  The only -- when we lift

25      fingerprints, usually we take them to Columbus,

1       and they're also sent to the Alabama State Crime

2       Lab in Montgomery or Auburn.  I think they've got

3       two or three other crime labs in the State of

4       Alabama.

5   Q   So anybody that commits a crime in the State of

6       Alabama, if they've not previously been convicted

7       in the State of Alabama or Georgia, then they

8       wouldn't show up?

9   A   That's true.

10   Q   Okay.  The day after or, I guess, August the 27th

11       of 2000, did you go to Gateway Lincoln-Mercury to

12       see if a vehicle had been left there?

13   A   Yes.

14   Q   And did you see a vehicle --

15   A   Yes, I did.

16   Q   -- that had been left at Gateway Lincoln?

17   A   Yes, I did.

18   Q   And I think you testified that the manager

19       instructed you that there was a vehicle still in

20       the parking lot from the day before; is that

21       correct?

22   A   No.  That was that evening, I'm sorry.  That was

23       that evening, that same evening.

24   Q   Oh, okay.  And you ran a tag number which was on

25       that vehicle and it came back to be to who?

1    A    If I can remember correctly, it was Affie Mae
2         Tyson.
3    Q    And you went to speak to Ms. Tyson?
4    A    Yes, I did.
5    Q    Did she tell you something that just made you
6         dismiss her or anybody that she's related to or
7         knows as a suspect in this case?
8    A    Basically, all I had to go on at that particular
9         time was what she had to tell me, and she just
10        told me that she had left the car there.  She had
11        had car problems, and she was going to go back
12        and pick it up.
13   Q    So you were investigating a pretty heinous
14        crime --
15   A    Yes, sir.
16   Q    -- in your eyes?  And you took the word of the
17        lady that just said the vehicle was there and
18        that's all?
19   A    Yes, I did.
20   Q    You testified that you went up to Lanett, Alabama
21        on a tip from a lady that called down to you and
22        said that she had seen the vehicle in question?
23   A    Yes, sir.
24   Q    Did anything materialize out of a conversation
25        with her?

1   A    What I've testified to here today, sir.

2   Q    That it was a dead end?

3   A    Yes, sir.

4   Q    When you found the -- strike that.  Could you

5        explain to me about the Identi-Kit and how it

6        works?

7   A    What it is, it's a system that we use where

8        you -- it has different, like I said, facial

9        structures, skin tones, different sets of eyes,

10       et cetera, and you go based on what the victim is

11       telling you at that point as they're describing

12       this individual, and you just go to each -- like

13       you start with maybe the eye section first, and

14       you go through the eye section and find out what

15       will go best with the eyes and et cetera and on

16       down through the rest of the face.

17  Q    So it's kind of like a Mr. Potato Head; is that

18       the way I understand you?

19  A    Well, I wouldn't call it that.

20  Q    You pull eyes and stick them on?  Is that kind of

21       the way I understand you?

22  A    Well, it may not sound more constructive than

23       that, but it takes some work to do it.

24  Q    On October the 19th when the Defendant was

25       arrested, did you take fingerprints of the

1       Defendant?

2  A   The fingerprints, I believe, were taken at the

3       Muscogee County jail, if I'm not mistaken, but

4       they were taken.

5  Q   And did you run them across all the other

6       fingerprints that were gathered up in this case?

7  A   I took his set of fingerprints along with the

8       prints lifted, yes, sir, and took them back to

9       the Columbus Police Department.

10  Q   And did any of those fingerprints match?

11  A   No, they did not.

12  Q   Not one?

13  A   Not one.

14  Q   In processing the vehicle and processing out at

15       Gateway Lincoln-Mercury, did you find any

16       physical evidence that ties this Defendant to

17       this crime?

18  A   State that again?

19  Q   In processing the Lincoln Navigator for

20       fingerprints, clothing, so forth, and processing

21       fingerprints out at Gateway Lincoln-Mercury, you

22       did not find any physical evidence that links

23       this Defendant to this crime?

24  A   No, sir.

25         MR. POPE:  I have no further questions, Your

1      Honor.

2                    REDIRECT EXAMINATION

3   BY MR. DAVIS:

4   Q    Is my fingerprint right there?

5   A    Could be.  Then again it could not.

6   Q    Could be, might not be; right?

7   A    That's correct.

8   Q    How long does a fingerprint last?

9   A    It depends on the climate.  Also depends on what

10       a person eats.

11  Q    If it's hot and sweaty, does that make a

12       difference?

13  A    It could be, but like I said, it depends on

14       climate and also what an individual eats.  It

15       just depends.

16  Q    Are some surfaces better than other surfaces to

17       get fingerprints?

18  A    That's true.

19  Q    You don't have any idea how many hundreds or

20       thousands of people may have been in or touched

21       that Lincoln Navigator, do you?

22  A    That's correct, from where it was recovered.

23  Q    Or how many hundreds or thousands of people had

24       been in Mr. Jackson's office or Mr. Lavoie's

25       office?

1  A    That's correct.

2  Q    What percentage of cases that you've worked in

3       all your years as an investigator have you

4       matched fingerprints to a defendant?

5  A    It happens.  It happens every now and then, but

6       it's not a hundred percent thing.  It doesn't

7       happen all the time.

8  Q    It's pretty rare actually, isn't it?

9  A    Yes, sir.

10 Q    And when Mr. Pope was asking you about did you

11      find any physical evidence that linked the

12      Defendant to this crime, he didn't mention -- he

13      didn't mention these things, did he?

14 A    No, sir.

15 Q    And they were found on the Defendant?

16 A    Yes, sir.

17 Q    The videotape that you went, as a part of your

18      investigation trying to follow every lead, to

19      Lanett, you went and brought it to Mr. Jackson,

20      and that's not the guy; right?

21 A    That's correct.

22 Q    You don't know who touched that vehicle or had

23      that vehicle or was in the vehicle from the time

24      that Mr. Jackson was shot on 431 South until the

25      time it was recovered abandoned on the street in

1       Birmingham, Alabama?

2  A    That's correct.

3  Q    Thank you very much.

4         MR. DAVIS:  No further questions.

5            RECROSS-EXAMINATION

6  BY MR. POPE:

7  Q    Did you do a thorough canvassing of that vehicle

8       for fingerprints?

9  A    As much as possible, yes, sir.

10  Q    If you have a hundred thousand people that touch

11       a vehicle, you could have a hundred thousand

12       fingerprints; isn't that possible?

13  A    It's possible.

14  Q    When you talk about surfaces that react to

15       fingerprints differently, would you say that

16       metal is a good conductor, I guess is what I'm

17       looking for, conductor of a fingerprint?

18  A    It's a good conductor.

19  Q    How about vinyl?

20  A    Not as good as metal or glass, but it's fair.

21       It's a fair surface.

22  Q    Leather?

23  A    Not the same as vinyl.

24         MR. POPE:  No further questions.

25         MR. DAVIS:  No further questions.  Thank

1    you, Mike.

2          THE WITNESS:  Thank you.

3          MR. DAVIS:  If it please the Court, at

4    this --

5          THE COURT:  Who's the State's next witness?

6          MR. DAVIS:  I'm sorry?

7          THE COURT:  Do you have another witness?

8          MR. DAVIS:  Judge, we do not.  At this time

9    the State is prepared to rest.  However, I move

10   to introduce any exhibit that we may have

11   previously offered but not had introduced.  I

12   believe they're all in, according to my count.

13         THE COURT:  I don't remember any that were

14   offered that were not entered into evidence.

15         MR. DAVIS:  At this time the State of

16   Alabama rests.

17         THE COURT:  All right, ladies and

18   gentlemen.  We've been going about an hour.  This

19   will be a good time to take a recess.  I'll send

20   you to the jury room, and we'll come back with

21   the next witness.  Thank you.  Keep in mind do

22   not discuss this case until it's submitted to you

23   for your deliberations under the instructions of

24   the Court.

25              (Jury not present.)

THE COURT:  Does either party have any

written jury instructions they wish to submit?

MR. DAVIS:  Judge, we would only ask for an

instruction on flight.

MR. POPE:  Yes, Your Honor.

(Brief pause.)

MR. POPE:  Your Honor, at this time I'd like

to make a motion for acquittal in both the action

for the attempted murder and also for the action

against the Defendant in robbery in the first

degree in that the State has failed to make a

prima facie case against the Defendant.

THE COURT:  I'm going to deny your motion.

MR. DAVIS:  Judge, we're going to take 10

minutes?

THE COURT:  Yes.

(Recess.)

(Jury not present.)

MR. POPE:  Your Honor, the defense would

like to withdraw the jury instruction number six.

(Jury present.)

MR. POPE:  Your Honor, at this time the

defense would like to call Morris Griggs.

THE COURT:  All right.

<u>MORRIS GRIGGS</u>

1

2       was sworn and testified as follows:

3                    <u>DIRECT EXAMINATION</u>

4    <u>BY MR. POPE:</u>

5    Q    Would you please state your full name, please?

6    A    Morris Griggs.

7    Q    Are you related to the Defendant, Avery Griggs?

8    A    Yes.

9    Q    And how are you related?

10   A    He's my nephew.

11   Q    Where do you live, Mr. Griggs?

12   A    Presently, 3573 Green Forest Drive, Columbus,

13        Georgia.

14   Q    Have you ever lived at 946 34th Avenue, Columbus,

15        Georgia?

16   A    Yes, sir.

17   Q    When did you reside at that address?

18   A    '97 and '98, part of '99.

19            MR. POPE:  No further questions, Your

20        Honor.

21            MR. DAVIS:  No questions.

22            THE COURT:  May this witness be excused?

23            MR. POPE:  Yes, Your Honor.

24            THE COURT:  Thank you.

25            MR. POPE:  And with that, Your Honor, the

1    defense rests.

2         THE COURT:  Does the State have any rebuttal

3    witness?

4         MR. DAVIS:  No, sir.

5         THE COURT:  Ladies and gentlemen of the

6    jury, that would conclude the evidence

7    presentation phase of the trial.  We'll now

8    proceed with closing argument.

9         Does the State have anything to present at

10   this time?

11        MR. DAVIS:  If it please the Court, at this

12   time the State would waive its right to the first

13   close while reserving its right to the rebuttal

14   or final argument.

15        THE COURT:  Mr. Pope, do you have anything

16   to present at this time?

17        MR. POPE:  Yes, Your Honor.

18             (Closing argument by Mr. Pope.)

19        MR. DAVIS:  Judge, could we approach the

20   bench?

21        THE COURT:  Yes, you may.

22             (Bench conference, off record.)

23        MR. DAVIS:  Excuse me, Mr. Pope.

24        THE COURT:  Okay.

25             (Closing argument by Mr. Pope

1            continues.)

2            (Closing by Mr. Pope concludes.)

3       MR. DAVIS:  Judge, could we approach the

4   bench?

5       THE COURT:  Yes.

6            (Bench conference, off record.)

7            (Final argument by Mr. Davis.)

8       MR. POPE:  Objection.

9       MR. DAVIS:  Taking information that he wrote

10  down.

11      THE COURT:  What is your objection based

12  upon?

13      MR. POPE:  May I approach?

14      THE COURT:  Yes, you may.

15      MR. POPE:  Mr. Davis?

16            (Bench conference, off record.)

17      MR. DAVIS:  I'll withdraw it, if it please

18  the Court.

19      THE COURT:  Well, that's up to you.

20      MR. DAVIS:  I'll withdraw it.

21            (Final argument by Mr. Davis

22             continues.)

23            (Final argument by Mr. Davis

24             concludes.)

25      THE COURT:  All right, ladies and gentlemen

1   of the jury.  That would conclude the closing

2   argument phase of the jury.  The Court will now

3   instruct you on the procedure that you will

4   follow in reaching your verdict as well as the

5   law to be applied to the facts in this case.

6       The attorneys' statement and arguments are

7   intended to help you understand the evidence and

8   apply the law.  However, their statements are not

9   evidence, and you should disregard any remark,

10  statement or argument which is not supported by

11  the evidence or by the law as given to you by the

12  Court.  Likewise, statements made by the Court

13  are not evidence and are not to be considered by

14  you as evidence.

15      It is the duty of the judge to instruct the

16  jury as to the law applicable to the particular

17  case, to define the issues involved, and it is

18  your duty to follow the law as so stated to you

19  by the judge.  You will, therefore, render a

20  verdict in accordance with the facts as you

21  determine them from the evidence and the law as

22  given to you by the Court.

23      All the witnesses who testified today were

24  sworn and testified under oath.  Their testimony

25  is evidence.  There were exhibits offered that

1    were received by the Court.  These exhibits are

2    evidence.  It will be upon this testimony and

3    these exhibits, and only the testimony and the

4    exhibits that were entered, that you may consider

5    in arriving at your final verdict.

6        The judge is not permitted by law to express

7    his opinion or comment on the effect of the

8    evidence presented to you or the credibility of

9    any witness in the case.  Any ruling, statement

10   or expression which may have been made by me

11   during the course of this trial is not to be

12   considered by you as any effort on my part to

13   convey to you any feeling or opinion about the

14   facts in this case or cases or the credibility of

15   any witness.

16       As a juror, you will be the sole and

17   exclusive judge of the facts.  It will be your

18   duty to attempt to reconcile the testimony of all

19   the witnesses so as to make them all speak the

20   truth, if this can be done reasonably.  If you

21   cannot reasonably reconcile all the testimony, it

22   is then your duty to consider the testimony with

23   a view of determining what the true facts are.

24   In so doing, you may accept or reject any part of

25   the testimony of any witness and accept only the

testimony you consider worthy of belief.

In determining what the true facts are from the evidence, you may take into consideration any natural interest or bias a witness may have as a result of any connection with the case. You may take into consideration the interest or bias a witness may have shown while testifying. And you may take into consideration the demeanor of any witness, as to whether the witness has apparently testified frankly or evasively. You may take into consideration any matter which you would in your everyday affairs in passing upon the truthfulness and accuracy of the testimony. Weigh the testimony in the light of your common observation and experience and reach a verdict that will be based upon the truth as you determine it from all of the evidence. In arriving at a verdict in this case, you must not permit sympathy, prejudice or emotion to influence you.

The burden is upon the State of Alabama to prove the Defendant guilty as charged in each of these cases. Before a conviction can be had in each of the cases, the State must satisfy each and every member of the jury of the Defendant's

guilt beyond a reasonable doubt. Even if the State demonstrates a probability of guilt, if it does not establish it beyond a reasonable doubt, you must acquit the Defendant.

The phrase reasonable doubt is self-explanatory. Efforts to define it do not always clarify the term. It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all the evidence in the case. It is a doubt based upon reason and common sense. It does not mean a vague or arbitrary notion, but is an actual doubt based upon the evidence, the lack of evidence, a conflict in the evidence, or a combination of these things. It is a doubt that remains after going over in your minds the entire case and giving consideration to all the testimony. It is distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

If, after considering all the evidence, you are convinced of the Defendant's guilt beyond a

reasonable doubt, then it would be your duty to convict the Defendant. However, if you still have a reasonable doubt, then the Defendant is entitled to the benefit of that doubt and you should acquit him.

The Defendant, Avery Griggs, is charged with the offense of robbery in the first degree. A person commits the crime of robbery in the first degree if, in the course of committing a theft, he uses or threatens the imminent use of force against the person or the owner of the property or any person present with the intent to overcome that person's physical resistance or physical power of resistance, and in so doing, he's armed with a deadly weapon.

To convict, the State of Alabama must prove beyond a reasonable doubt each of the following elements of the robbery in the first degree: One, that the Defendant, Avery Griggs, committed or attempted to commit theft of a Lincoln Navigator automobile, property in the possession of Demetrius Jackson. Two, that in the course of committing or attempting to commit the theft, the Defendant, Avery Griggs, used force against the person of Demetrius Jackson with the intent to

1  overcome his physical resistance or physical

2  power to resist, or threatened the imminent use

3  of force against the person of Demetrius Jackson

4  with the intent to compel acquiescence to the

5  taking of or escaping with the property.  And

6  three, that the Defendant was armed with a deadly

7  weapon.

8  A person commits the crime of theft of

9  property if he knowingly obtains or exerts

10  unauthorized control over the property of another

11  with intent to deprive the owner of his

12  property.  A deadly weapon is a firearm or

13  anything manifestly designed, made or adapted for

14  the purpose of inflicting death or serious

15  physical injury.  A person acts intentionally

16  with respect to a result or to conduct when his

17  purpose is to cause that result or to engage in

18  that conduct.  A person acts knowingly with

19  respect to conduct or to a circumstance when he

20  is aware that his conduct is of that nature or

21  that the circumstance exists.

22  If you find from the evidence that the State

23  has proved beyond a reasonable doubt each of the

24  above elements of the offense of robbery in the

25  first degree as charged, then you shall find the

Defendant guilty of robbery in the first degree.
If you find that the State has failed to prove
beyond a reasonable doubt any one or more of the
elements of the offense of robbery in the first
degree, then you cannot find the Defendant guilty
of robbery in the first degree.

The Defendant, Avery Griggs, is charged with
the offense of attempted murder. A person
commits the crime of attempted murder if, with
intent to commit the offense attempted, he does
any overt act towards the commission of that
offense. To convict, the State must prove beyond
a reasonable doubt each of the following elements
of the offense of attempted murder: One, that
the Defendant, Avery Griggs, intended to commit
the crime of murder. And two, that acting with
intent to commit the crime of murder, the
Defendant did an overt act towards the commission
of such offense.

A person commits the crime of murder if he
causes the death of another, and in performing
the act or acts which caused the death of that
person, he intends to kill that person. A person
acts intentionally about a result or to conduct
when his purpose is to cause that result or to

engage in that conduct.  What constitutes

commission of an overt act towards the commission

of the offense of murder is for the jury to

decide under the circumstances.  It requires that

the Defendant do some act directed towards the

eventual carrying out of the crime.  However,

mere remote preparatory acts which are not

reasonably in the chain of causation leading to

effectuation or commission of the crime are not

sufficient.

If you find from the evidence that the State

has proved beyond a reasonable doubt each of the

above elements of the offense of attempted murder

as charged, then you shall find the Defendant

guilty of attempted murder.  If you find that the

State has failed to prove beyond a reasonable

doubt any one or more of the elements of the

offense of attempted murder as charged, then you

cannot find the Defendant guilty of attempted

murder.

The Defendant, Avery Griggs, is charged with

a lesser included offense of the charge of

attempted murder known as assault in the first

degree.  A person commits the offense of assault

in the first degree if he causes serious physical

1    injury to any person by means of a deadly weapon

2    or dangerous instrument with the intent to cause

3    serious physical injury to another person. To

4    convict, the State must prove beyond a reasonable

5    doubt each of the following elements of assault

6    in the first degree: One, that the Defendant,

7    Avery Griggs, caused serious physical injury to

8    another person; namely, Demetrius Jackson. That

9    the Defendant caused such injury by means of a

10   deadly weapon or a dangerous instrument, in this

11   case alleged to be a pistol. And that the

12   Defendant acted with the intent to cause serious

13   physical injury to another person.

14       A person acts intentionally with respect to

15   a result or to conduct when his purpose is to

16   cause that result or to engage in that conduct.

17   Serious physical injury means physical injury

18   which creates a substantial risk of death or

19   which causes serious and protracted

20   disfigurement, protracted impairment of health or

21   protracted loss or impairment of the function of

22   a bodily organ. Deadly weapon means a firearm or

23   anything manifestly designed, made or adapted for

24   the purpose of inflicting death or serious

25   physical injury and includes but is not limited

1   to a pistol, rifle or shotgun, or a switchblade

2   knife, gravity knife, stiletto, sword or dagger,

3   or any billy, blackjack, bludgeon or metal

4   knuckles.

5       If, from the evidence, you find that the

6   State has proved beyond a reasonable doubt each

7   of the elements of the offense of assault in the

8   first degree as a lesser included offense of the

9   charge of attempted murder, then you shall find

10  the Defendant guilty of assault in the first

11  degree.  If you find that the State has failed to

12  prove beyond a reasonable doubt any one or more

13  of the elements of the offense of assault in the

14  first degree as a lesser included charge of the

15  offense of attempted murder, then you cannot find

16  the Defendant guilty of assault in the first

17  degree.

18      The flight of a defendant in a criminal case

19  may or may not be considered as a circumstance

20  tending to prove guilt depending on the motive

21  which prompted it.  Whether a consciousness of

22  guilt and a pending apprehension of being brought

23  to justice caused the flight or whether it's

24  caused from some other motive, the jury may look

25  to all the surrounding circumstances to determine

this fact.

Serious physical injury is physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ. The State carries the burden to prove to you beyond a reasonable doubt that if injuries were sustained by actions of the Defendant in the lesser included charge of assault in the first degree, then those injuries meet the definition of a serious physical injury.

Ladies and gentlemen of the jury, you are charged that you may not infer guilt or innocence upon the Defendant for not testifying. The Defendant has a constitutional right not to testify, and you cannot hold that against him for exercising that right. You are not to consider his not testifying in your deliberations.

For your convenience, the Court has prepared for your use in this case verdict forms which will be explained to you. No inferences are to be drawn by you from the fact that the Court has supplied you with these forms or from the order

in which the Court reads them to you.  When you
have reached a verdict, you will select and
complete the verdict form which corresponds to
your verdict and which is to be signed by the
foreperson of the jury whom you elect.  It must
be dated by the foreperson as well.  All 12 of
you must agree and any verdict that you return to
the Court must be unanimous.  When you have
reached your verdicts in these two cases, it will
be necessary for you to notify the bailiff, Mr.
Mitchell, and he will inform me, and you will be
returned to the court to return your verdict.

One of the key words that I read out to you
was all 12 of you.  There were actually 13 jurors
that were impaneled.  One of you was impaneled as
an alternate juror in case during the trial one
of the first 12 for some reason could not
continue.  Had the alternate juror not been
impaneled and one of the first 12 could not
continue to serve any longer, we would have had
to suspend the trial and start the trial all over
again.  We don't tell the 13th juror in advance
who they are because we don't want them thinking
that, well, I'm an alternate juror and I don't
have to pay as much attention as the first 12

1    do.  You might be surprised of how often a 13th

2    juror gets moved up to deliberate for some reason

3    or other.

4         Ms. Jennings, you were the 13th juror today,

5    and I will excuse you at this time.  Please be

6    back tomorrow morning at 9:00.

7         MR. DAVIS:  Ms. Jennings, thank you for your

8    service.

9              (Alternate juror excused.)

10        THE COURT:  There are two possible verdict

11   forms for the jury to consider on the charge of

12   robbery first degree and that is a guilty verdict

13   form and a not guilty verdict form.

14        If, from the evidence, you should determine

15   that the Defendant, Avery Griggs, is guilty of

16   the offense of robbery in the first degree, you

17   would select the guilty verdict form that reads,

18   "We, the jury, find the Defendant, Avery Griggs,

19   guilty of the offense of robbery first degree as

20   charged in the indictment."  And if that should

21   be your verdict, it should be signed and dated by

22   the foreperson of the jury.  If, however, from

23   the evidence, you find that the Defendant is not

24   guilty of the offense of robbery in the first

25   degree, you would select the not guilty verdict

1   form which reads, "We, the jury, find the

2   Defendant, Avery Griggs, not guilty of the

3   offense of robbery first degree as charged in the

4   indictment."  And if that should be your verdict,

5   it should be signed and dated by the foreperson

6   of the jury.

7       There are two verdict forms for you to

8   consider on the charge of attempted murder.  If,

9   from the evidence, you should find the Defendant

10  guilty of the offense of the charge of attempted

11  murder, you would select the guilty verdict form

12  that reads, "We, the jury, find the Defendant,

13  Avery Griggs, guilty of the offense of attempted

14  murder as charged in the indictment."  And if

15  that should be your verdict, it should be signed

16  and dated by the foreperson of the jury.  If,

17  however, from the evidence, you find the

18  Defendant not guilty of the offense of attempted

19  murder, you would select the not guilty verdict

20  form that reads, "We, the jury, find the

21  Defendant, Avery Griggs, not guilty of the

22  offense of attempted murder as charged in the

23  indictment."

24      There is a third charge in which you may or

25  may not consider depending upon your finding on

the attempted murder charge.  If you find the
Defendant guilty of the offense of attempted
murder, you would go no further and not consider
the charge of assault in the first degree.  If,
however, you find the Defendant not guilty of the
offense of attempted murder, you would go on to
deliberate the charge of assault in the first
degree.  And, if from the evidence, you find that
the Defendant is guilty of the offense of assault
in the first degree, you would select the guilty
verdict form that reads, "We, the jury, find the
Defendant, Avery Griggs, guilty of the offense of
assault in the first degree, which is a lesser
included charge of attempted murder as charged in
the indictment."  And if that should be your
verdict, it should be signed and dated by the
foreperson of the jury.

If you have found the Defendant not guilty
of the offense of attempted murder and you go on
to consider the charge of assault in the first
degree, and you find the Defendant not guilty of
that offense, you would consider the not guilty
verdict form -- you would return the not guilty
verdict form that reads, "We, the jury, find the
Defendant, Avery Griggs, not guilty of the

offense of assault first degree, which is a
lesser included charge of attempted murder as
charged in the indictment." And if that should
be your verdict, it should be signed and dated by
the foreperson of the jury. And again, I'll
point out, you will not consider that charge of
assault in the first degree if you find the
Defendant guilty of the offense of attempted
murder.

Does the State have anything further?

MR. DAVIS: State's satisfied, if it please
the Court.

THE COURT: Defense have anything further?

MR. POPE: Defense is satisfied, Your Honor.

THE COURT: All right, ladies and gentlemen
of the jury. That would conclude the Court's
instruction. I'll send you to the jury room to
deliberate your verdict. The verdict forms will
be sent to the jury room for you as well as the
exhibits that have been entered. You first elect
a foreperson to moderate your discussion and
return your verdict and then begin deliberation.
When you've reached your verdict, please notify
Mr. Mitchell and he'll notify me, and we'll have
you returned to court. Thank you.

1          (Jury retires to begin their

2           deliberations.)

3          (Jury notification to the bailiff.)

4          (Jury present.)

5      THE COURT:  All right, ladies and gentlemen

6  of the jury.  It's my understanding you've

7  reached a verdict; is that correct?

8      THE FOREPERSON:  Yes.

9      THE COURT:  And who's been elected

10  foreperson?  All right.  Would you stand and read

11  the jury's verdict, first as to the charge of

12  robbery in the first degree?

13      THE FOREPERSON:  We, the jury, find the

14  Defendant, Avery Griggs, guilty of the offense of

15  robbery first degree as charged.

16      THE COURT:  And would you read the verdict

17  on the deliberation as to the charge of attempted

18  murder?

19      THE FOREPERSON:  We, the jury, find the

20  Defendant, Avery Griggs, guilty of the offense of

21  attempted murder as charged.

22      THE COURT:  Mr. Mitchell, will you hand me

23  the verdict forms, please, sir?

24          (Brief pause.)

25      THE COURT:  Ladies and gentlemen of the

jury, the verdict forms have been filled out in

proper order and the Court accepts your verdict

on each of these two charges.

I'm going to start on the first row and I

will ask you is this your verdict in each of

these two cases, and if it is, respond by saying

yes or nodding yes or saying, no, this is not my

verdict.

Is this your verdict, sir?

JUROR:  Yes, sir.

THE COURT:  Is this your verdict, sir?

JUROR:  Yes, sir.

THE COURT:  Is that your verdict, sir?

JUROR:  Yes.

THE COURT:  Is that your verdict, ma'am?

JUROR:  Yes.

THE COURT:  Is that your verdict, sir?

JUROR:  Yes.

THE COURT:  Are these your verdicts, sir?

JUROR:  Yes.

THE COURT:  Is that your verdict, sir?

JUROR:  Yes.

THE COURT:  Is that your verdict, ma'am?

JUROR:  Yes.

THE COURT:  Is this your verdict, ma'am?

1    JUROR: Yes.

2    THE COURT: Are these your verdicts, ma'am?

3    JUROR: Yes.

4    THE COURT: Are these your verdicts, ma'am?

5    JUROR: Yes.

6    THE COURT: Are these your verdicts, ma'am?

7    JUROR: Yes.

8    THE COURT: All right, ladies and gentlemen

9    of the jury. This would conclude your jury

10    service for today. Please be back tomorrow

11    morning at 9:00, and we'll proceed with the call

12    of another case. Thank you.

13    MR. DAVIS: Ladies and gentlemen, on behalf

14    of Mr. Jackson, thank you for being here today.

15    Thank you for your service.

16    (Jury dismissed.)

17    THE COURT: Mr. Griggs, the jury has found

18    you guilty of the offense of attempted murder and

19    of the offense of robbery in the first degree as

20    charged in the indictment. I will set sentencing

21    in these two cases until January the 7th and that

22    will be at 10:00 a.m., and I would direct that a

23    pre-sentence report be completed. You will be

24    remanded to the custody of the sheriff until

25    sentencing. The probation officer will come talk

1    with you in the jail to begin the pre-sentence

2    report.  Thank you.

3         THE DEFENDANT:  Yes, sir.

4         MR. DAVIS:  Thank you, Judge.

5         THE COURT:  Thank you.  And I'm not going to

6    set a bond.  No bond in this case.

7              (The trial ended on December 3, 2001.)

STATE OF ALABAMA

IN THE CIRCUIT COURT FOR THE COUNTY OF RUSSELL

TWENTY-SIXTH JUDICIAL CIRCUIT

CRIMINAL


STATE OF ALABAMA

     v.                        Case No. CC 01-252
                                 CC 01-253

AVERY L. GRIGGS,

       Defendant.
_____/


**S E N T E N C I N G**

Before:

        Honorable George R. Greene
        Phenix City, Alabama - February 21, 2002


APPEARANCES:

        For the State:
            Buster Landreau, Esq.
            Chief Deputy District Attorney

        For the Defendant:
            Kirk Pope, Esq.
            Phenix City, Alabama


Linda S. Wilson
Official Court Reporter

1    THE COURT:  Avery Griggs?

2        (Defendant approaches the bench.)

3    THE COURT:  This matter is set for

4  sentencing, the Defendant having previously been

5  adjudicated by a jury of guilty of the offense of

6  attempted murder and robbery in the first

7  degree.

8    Does Mr. Griggs have anything to present at

9  this time?

10   MR. POPE:  He does, Your Honor.  We would

11  like to present two letters, one to you and one

12  to Mr. Jackson, the victim in this case.

13        (Brief pause.)

14   THE COURT:  Does the Defendant have anything

15  further?

16   THE DEFENDANT:  No, sir.

17   THE COURT:  Does the State have anything at

18  this time?

19   MR. LANDREAU:  No, Your Honor.

20   THE COURT:  Is there a claim for

21  restitution?

22   MR. LANDREAU:  Judge, I do not have an

23  affidavit and, therefore, we do not claim at this

24  time.

25   THE COURT:  The Court has reviewed the

1  pre-sentence report in this matter.  One of the

2  things the Court would note, had not the victim

3  in this case been pretty tough, this would have

4  been a capital murder case and Mr. Griggs would

5  be sentenced to death in the electric chair

6  today.

7       Having previously been found guilty of the

8  offense of robbery in the first degree and

9  attempted murder, the Court would sentence the

10  Defendant to life in prison in each of the two

11  cases.  He'll be given credit for time served.

12       You can come stand right here.  You couldn't

13  face up to your victim.  You shot him with a gun

14  and left him rolling down the highway and didn't

15  even bother to say I'm sorry until it came time

16  for you to ask for leniency from the Court, and

17  the Court's going to give you the same leniency

18  you gave your victim.  I'm just sorry I can't

19  send you to the electric chair today because

20  that's where you deserve to go.  That's right.

21       THE DEFENDANT:  Okay.  And?

22       THE COURT:  You'll be given credit for time

23  served.  I would direct that you pay the court

24  costs of this case, a $250.00 Victims

25  Compensation Fund fee in each case.  You're to

1   reimburse the State of Alabama the cost of

2   appointed counsel fees, and as a condition of

3   parole or participation in any work release

4   program, you're to pay all court-ordered monies.

5       You have the right to appeal your conviction

6   and sentence, and if declared indigent, you have

7   the right to appointed counsel, and a court

8   reporter's transcript would be provided without

9   cost to you.

10      THE DEFENDANT:  That's it?

11          (End of proceedings.)

CERTIFICATE OF COMPLETION OF REPORTER'S TRANSCRIPT

AVERY L. GRIGGS,                    TO: The Clerk of the Court of
                                        Criminal Appeals of
         Appellant                      Alabama

         v.                             On Appeal From the
                                        Circuit Court of Russell
STATE OF ALABAMA                        County

                                    CASE NO. CC 01-252
                                             CC 01-253

                                    DATE OF NOTICE OF APPEAL:
                                    March 6, 2002


     I certify that I have this date completed and
filed with the clerk of the trial court the original
of a true and correct transcript of the proceedings
designated in the Reporter's Transcript Order.  All
pages are numbered serially, in the upper right corner
of each page, prefaced by a copy of the Reporter's
Transcript Order (Page No. 1) and an index, and ending
with the number appearing in the upper right corner of
this certificate.
     I certify that a copy of this certificate is this
date being served on counsel for defendant, the
Attorney General of Alabama, and the District
Attorney, along with a copy of the index.
     DATED this 20th day of August, 2002.




                              Linda Wilson
                              Linda S. Wilson
                              Official Court Reporter